WIESE *et al.*, *Appellants*, v. REMME.

Division One, June 22, 1897.

1. **Landlord and Tenant:** NEGLIGENCE OF BUILDER: DAMAGES.
Where a landlord contracts with a builder, exercising an independ-
ent calling, for the construction of a privy on his rented property, ac-
cording to the builder's own methods, without any control upon the
part of the landlord except as to the results to be obtained, the land-
lord is not liable for the wrongful acts of such builder. In this case
the builder, in constructing a privy on the rented property, dug the
vault seven feet deep, and permitted it to remain uninclosed, except
partially, for four months. It filled with water, the tenants' child fell
in and was drowned. *Held,* that the landlord was not liable in a suit
for damages by the child's parents.

2. ———: DAMAGES: CONTRIBUTORY NEGLIGENCE. Plaintiffs' two-year-
old child fell into a dangerous pit in their rented yard which was
thirty or forty feet from the rear door, had been there for months and
had filled with water when the child was drowned. They testified
that they knew it was dangerous, that it was under their control, and
that they did not restore a barrier which the contractor had previ-
ously placed around the pit and which had been blown down by a
violent storm a night or two before the accident. The evidence did
not show that the condition of the barrier at the time of the accident was
known to any other persons except the plaintiffs and the members
of their family. *Held,* that plaintiffs were guilty of contributory neg-
ligence in not barricading the pit so as to protect the child from
danger, and that they could not recover damages based on the neg-
ligence of either the landlord or contractor.

3. **Master and Servant.** The relation of master and servant does not exist between a landlord and a contractor, who performs the contract independently and according to his own methods and is responsible only for the result obtained.

*Appeal from St. Louis City Circuit Court.*

AFFIRMED.

*H. A. Loevy* for appellant.

(1) Respondent could enter the demised premises to make repairs, appellants consenting. 12 Am. and Eng. Ency. of Law, sec. 683. He is liable for such damage as is the natural consequence of his wrongful act. Christy, 24 Mo. App. 277, 278. (2) It being his duty to provide a vault, respondent can not escape liability on ground that the work was being done by his contractor. (3) The landlord is liable to his tenants for a nuisance he creates notwithstanding tenants in possession. (4) The landlord is required to keep the property free from nuisance; the tenant is not under obligation to do so. (5) No precise relationship between defendant and the contractor being shown, except that of employment, presumption is that it is that of master and servant. (6) Respondent as employer is liable for his incompetent or negligent contractor or workman, even if latter is an independent contractor. (7) Appellants were not guilty of contributory negligence so far as taking care of the child's person was concerned. It was not their duty to cover the pit, and they can not be condemned for the slightest failure to do so.

*J. M. Holmes* and *B. D. Kribben* for respondent.

(1) The evidence shows that the excavation in question was made by an original contractor, and re-

spondent is not answerable for his negligence.   Ray on
Negligence of Imposed Duties, p. 39, and cases cited.
(2) No evidence was offered tending to prove negligence
on the part of the contractor.   (3)   Respondent is not
liable as owner of the ground.   The primary duty of
care and protection of the premises is imposed by law
upon the occupants thereof, the plaintiffs in this case.
2 Wood's Landlord and Tenant [2 Ed.], pp. 1286-
1295, and cases cited; *Leonard v. Storer*, 115 Mass. 86;
*Mellon v. Morrill*, 126 Mass. 545; *Irvine v. Wood*, 51
N. Y. 224.   (4)   Plaintiffs were guilty of contribu-
tory negligence, which clearly appeared from their
own testimony, and hence can not recover.   2 Thomp-
son on Negligence, p. 1191; *Isabel v. Railroad*, 60 Mo.
475; *Vogg v. Railroad*, 36 S. W. Rep. 646.   (5)   There
was no proof tending to show that plaintiffs' child died
from the causes set forth in the petition.

BRACE, J.—Plaintiffs are husband and wife, and
sue in this action to recover the sum of $5,000 damages
for the death of their infant son Walter, aged two years
and two months at the time of his death.   At the close
of the plaintiffs' evidence, the court instructed the jury
that under the law and the evidence the plaintiffs could
not recover.   Thereupon the plaintiffs, after saving
their exceptions, took a nonsuit, and failing to have the
same set aside upon proper motion, bring the case
here by appeal.   The material facts disclosed by plain-
tiffs' evidence are as follows:
On the first of August, 1892, the defendant being
the owner of certain premises on the southeast corner
of Shaw avenue and Edwards street in the city of St.
Louis, rented the same to the plaintiff, Christian Weise,
who thereafter continued to occupy the premises as
defendant's tenant, with his family, consisting of his
wife, five boys and two girls, of whom Walter was the

youngest; using two of the rooms that connected with
each other for business purposes, one for a saloon, and
the other for a grocery store, and the remainder of the
building as a residence.    In the back yard and distant
about forty feet from the building, and used in connec-
tion therewith was a privy which some time in the fall
of 1892 defendant was notified by the city authorities
was a nuisance, which must be abated.    Thereupon he
contracted with one Volmer to construct a new privy
and vault for the premises, who, in pursuance of such
contract, about the middle of December, 1892, by his
servants entered upon the premises and made an exca-
vation for the vault of the new privy, distant ten or
fifteen feet from the old one, about six feet long, four
feet wide, and seven feet deep, and in the meantime
constructed a frame privy and placed it on the prem-
ises near the excavation ready to be put in place
when the excavation was walled up.    He did not pro-'
ceed, however, to have the vault walled, and the privy
put in place, but left the work in this condition, excus-
ing himself from proceeding with the brick work on
account of the state of the weather, and so it remained
until some time in January, 1893, or later, when the
attention of the defendant was called to the condition of
the work and the premises, by the plaintiff, in the
presence of Volmer, who, upon being rebuked by the
defendant for his delay in completing the job, promised
that he would at once go on and finish it.    This he did
not do, however, though frequently importuned by
the plaintiff to do so, but some time thereafter placed a
temporary barrier loosely constructed of barrels and
boxes, found in the yard and belonging to the plaintiffs,
around the unprotected sides of the excavation, in which
condition it remained until the night of the twelfth of
April, 1893, when a wind and rain storm arose which
filled the excavation with water and either disarranged

or blew aside the materials of the barrier, so as to leave the hole in places practically unguarded. This was the condition in which the premises were on the morning of the thirteenth of April, 1893, and as they were known to the plaintiffs and every member of their family then, and as they had been known to them during the four months preceding the accident.

Plaintiff, *Christian Wiese*, the father, testified: "We had a big rain shortly before this accident. Then it (the hole) got full. On the day my son fell in, it was level full; there was no guards or protection or fence around it on that date. There was nothing there to prevent a child or grown person from falling in." That he had looked at the hole often and considered it dangerous; that the barrier constructed by Volmer was not sufficient to keep a two-year-old boy out of there. That during the whole four months he (Wiese) took no precaution to protect it; that he "had nothing to do with the hole" . . . and "never did one solitary thing to protect it all that time."

Plaintiff, *Sophie Wiese*, testified: "I had no servants; Louisa (her daughter) helped me with the house work. She took care of the children—Rona, five years old, and Walter." . . . "Not quite two sides of the hole were in the yard, only a corner, any child could crawl between the barrels and boxes." . . . "I told him (Volmer) when he put them there they were no good; leave them away, they will do more harm than good." . . . "On the afternoon of the day when Walter was drowned, my daughter, me and the little girl Rona, were at home. At that time of day there is not much business doing, so the oldest son went down town and I took care of the business and the oldest girl and the two little ones were out in the yard sweeping up the yard after the rain, and hay and such as that was around in the yard, and she

raked it up and brought the rake into the saloon rear door and set the rake in the corner, for I always kept it in this certain corner; and no more than she had put it there, she was going to take a drink, to take the glass up, she never touched anything in it—the little girl came in the rear door and hollered, 'Mamma, mamma,' and of course I knew what was up then. I ran out and all I seen of him was just a part of his sleeve and I kneeled down and pulled him out and brought him in the house and called help. When I pulled him out of the water there was no life to be seen in him. The hole was level full of water. Level to the top." And in the course of her cross-examination she testified: "He (Volmer) did nothing about protecting the place until a week before the accident. I did not either. The yard was full of mud from the hole, and the new privy house was standing in the middle of the place, and the lumber was there that was torn off the fence and other lumber that he had been using for building purposes. The hole was about (indicating four by six feet) that big."

"Q. It would have been a very easy thing to have covered that over with boards? A. I suppose it would, but it was none of my business to cover it over. There was not plenty of lumber lying around that could be used for that purpose. That from the fence was only scantling; you could break it. It wouldn't even reach over the hole. The boxes and barrels would not stand up on that ground. Only two sides of the hole were within the yard.

"Q. It would have been very easy to have pulled that dirt away and have put a barrier around it? A. (screaming) Oh, man, if I knowed that child would have died I would have covered it up myself.

"Q. Undoubtedly, you could have done so very easily? A. I would have before he would have been drowned.

"*Q*. Of course, I am only inquiring about it, Mrs. Wiese. *A*. Oh, you hurt my feelings too much, you brute (crying). . . . I considered it dangerous all the time. That is the reason I have been taking care of my child myself. I watched him as I did my own eye, but still somebody will get something in the eye once in awhile."

*Rudolph Wiese*, the son aged twenty-four, testified that "about three to five feet of the hole was unprotected," and in the course of his cross-examination testified as follows:

"*Q*. There was a big storm there the night before, was there not? *A*. Well, I couldn't tell you the date, but there was a rain there. Don't know whether it was a heavy rain or not. A house in course of erection there, not well dressed, was blown a little off its base. Can't say whether the boxes and barrels blew down that night or before. There may be one blown into the hole.

"*Q*. You made no effort to put them back, did you? *A*. It was none of my business to. I did not, that I remember. Had nothing to protect it with. Don't see on what grounds I had a right to protect it.

"*Q*. Did you take any measures whatever to protect that place? *A*. No; I was twenty-four years old at that time. My father and mother are both able-bodied people, and so far as I know they never took any measures to protect that hole."

Re-direct examination:

"While the boxes and barrels were there, I did not think they were any protection in the least. Any of them just taking hold of them like that, they were bound to go. There was nothing there to hold them from going. I was a resident of my father's house from the middle of December when this vault was started, until April 13, when Walter fell into it.

The daughter, *Mrs. Louisa Barrett*, testified as follows:

Direct examination by Mr. Loevy.

"I am the daughter of Mr. and Mrs. Wiese, the plaintiffs in this case. Was married on 20th of last June. I am living in the next block now. Between December 1st, 1892, and April 15th, 1893, was living with my father and mother, on the corner of Shaw avenue and Edwards street. My father was running a saloon at 5256 Patterson avenue. My brother ran the store and grocery at home. My mother waited on customers. I seldom did. My mother was attending the store that day. My brother was not at home at the time; he was down town; he attended to the saloon chiefly. I had charge of Walter. On April 13th I was in the yard, raking up the yard, and Walter and Rona were in the yard with me in front of the kitchen door which opened into the yard. My sister and brother were in front of the door. When I got through I brought the rake in the saloon, and I went behind the bar to take a drink and I set the glass on the bar and by that time my sister came in and she says, 'Mamma, mamma.' And my mother run out and she seen my brother in the water.

"Q. What were the children doing when you were raking up the yard? A. They was playing in front of the kitchen door. There was nobody else in the yard but the two children and myself. While I was raking they were playing together. I put the rake in the saloon in the corner, which was about 20 feet from the kitchen door. It was about two or three minutes from the time I left Walter until my sister came running in. Walter had been in the yard two or three days before that day, and I was always with him, to take care of him. That was the first time he had been out that

spring. It had not been good enough weather for children to play out.

"Q. Was there anything there to prevent Walter falling in the hole? *A.* A few barrels and boxes. I don't know just exactly when they were put there.

"*Q.* Were they there on the day he was drowned? A. No, sir; there was a few standing there. Mr. Volmer had put them there. There was nothing to fasten the boxes together. There was the ground laying there and it was in hills and holes and the boxes were standing on top. My mother ran out and I ran after her and I just seen her pull him out of the water. We run in the saloon and by that time some people came in and helped us. His face was kind of black like at the time; kind of pale. I ran down for my father and a colored boy ran for the doctor.

"*Q.* Was anyone beside yourself placed in charge of Walter? *A.* All of us was taking care of him. I took the most care of him, because I did not have anything else to do.

"*Q.* While you were in the yard did you take care that he did not go near this hole? *A.* Yes, sir, he was in front of the door always. I kept him near me. There was a paling fence on the east side of the hole and there was a few palings knocked off for the ground to be thrown out of the hole. The space between the paling was wide enough for Walter to crawl through. There was nobody around there at all to prevent his falling into the water. I knew the danger of his going to that place. My father and mother had spoken to me about being careful of him—I was careful."

1. Although the child did not die until three days after he fell into the water, and there is no direct evidence as to the cause of his death, we think it may be reasonably inferred from the facts and circum-

stances in evidence that his death was the result of the accident, and the case should not have been taken from the jury on that ground.

2.   While the terms of the contract between the defendant and Volmer for the erection of the new privy does not appear from the plaintiffs' evidence, it does appear therefrom that Volmer was exercising the independent calling of a builder and doing much work of that character in the neighborhood.   That defendant contracted with him to erect the privy; and all the evidence tends to prove that he was to do so according to his own methods, without any control upon the part of the defendant beyond the result to be obtained.   As such contractor, and with the knowledge upon the part of the plaintiffs of his character as such, Volmer entered upon the premises which were in the exclusive control of the plaintiffs and with their assent and permission commenced the work which he had contracted to do.   With him, or the work, the defendant thereafter had no connection whatever, except to rebuke the contractor for not finishing his work as hereinbefore stated.   The negligence charged in the petition, and the only negligence which the evidence tended to prove, was the negligence of the contractor in failing to complete his work within a reasonable time, and in failing to keep the excavation securely guarded in the meantime.   We find nothing in the circumstances of this case to take it out of the well settled rule that "where a person contracts with another, exercising an independent calling, to do a work for him according to the contractor's own methods and not subject to his control or orders except as to the results to be obtained, the former is not liable for the wrongful acts of such contractor or his servants."   *Long v. Moon*, 107 Mo. 334, and authorities cited on page 340.   It is not alleged and

Wiese v. Remme.

there is no evidence tending to prove that the contractor was not a competent person to do the work. The work was not in itself of a dangerous character, did not necessarily create a nuisance, nor involve a trespass upon the property of others, and the defendant did not interfere in the direction of its performance. In such case the defendant can not be held liable for the negligence of the contractor and the action of the court might well be sustained on this ground.

3. If, however, it could be conceded that the relation which Volmer sustained to the defendant was that of a servant, the nonsuit in this case would have to be sustained on the ground of the contributory negligence of the plaintiffs. Here was an unguarded or an insufficiently guarded hole, filled with water, on their own premises, and under their control, which was known to and regarded by them as dangerous for a child of the age of their infant son. It would have required but a moment's thought, and a minute's labor, after the storm, when such barrier as was there was broken down, and when its condition was probably known only to themselves, to have barricaded the exposure of three to five feet so as to have protected their infant child from danger. The care and protection which a parent owes to its child required that they should have taken that much thought for the safety of the child, and expended that much labor at least, for its protection against this imminent and known danger, before thoughtlessly exposing him to it.. There is nothing in the circumstances surrounding them that tends in any manner to excuse them from this plain and obvious duty which they neglected.

The judgment of the circuit court is affirmed. All concur.