I. F. BONJOUR, Administrator, Appellee, v. IOWA TELEPHONE COMPANY, Appellant.

**TELEGRAPHS AND TELEPHONES:** Negligence—Maintenance of
1 Wires—Private Driveways. The original construction or subsequent maintenance of telephone wires over a private driveway, so low as to strike and injure one properly using the driveway, constitutes negligence—at least justifies a jury in so finding.

**NEGLIGENCE:** Proximate Cause—Degree and Manner of Proof—
2 Negativing Causes—Telegraphs and Telephones—Dangerous Position of Wires. That a certain negligent act caused an injury need not be shown by direct and positive proof, nor need it be shown beyond a reasonable doubt. All possible causes other than the negligence of defendant need not be negatived. It will be sufficient if harmonious, consistent and related facts and circumstances are such as to fairly warrant the conclusion that the negligence alleged, and no other, was the cause of the accident. Evidence reviewed, and held to justify a jury's finding that deceased was swept from a load of hay by telephone wires, even though no living eyewitness saw the wires hit the deceased.

**TELEGRAPHS AND TELEPHONES:** Maintenance of Wires—
3 Knowledge of Deceased—Contributory Negligence. Evidence reviewed, and held to present a jury question whether deceased

was guilty of contributory negligence in maintaining his position on top of a load of hay as it was driven beneath telephone wires, even though deceased was admittedly familiar with the position of the wires and had driven beneath the same on the day preceding.

**TRIAL:** **Verdicts—$3,000—Excessiveness.** Verdict of $3,000 sustained. Deceased was 68 years of age, with a life expectancy of 10 years. He and his wife constituted the family; he had a small homestead which he devoted to fruit; his health and habits were good; he was industrious and economical. The year preceding his death, his income exceeded his living expenses by $700.

*Appeal from Franklin District Court.*—CHARLES E. ALBROOK, Judge.

SATURDAY, DECEMBER 18, 1915.

REHEARING DENIED TUESDAY, MAY 2, 1916.

ACTION at law to recover damages for the death of plaintiff's intestate. Verdict and judgment for plaintiff, and defendant appeals.—*Affirmed.*

*Parker, Parrish & Miller,* and *E. P. Andrews,* for appellant.

*Clock, Saley & Clock,* for appellee.

WEAVER, J.—The defendant owns a telephone system in the city of Hampton, Iowa. In connection therewith, defendant maintained certain wires stretched on poles along a certain street upon which abuts a residence property owned by one Archie Bonjour, son of the deceased. The street runs north and south, and leading therefrom at right angles is a driveway or private road into Bonjour's premises. At the time of the incident from which this litigation arises, the defendant was maintaining two lines or "leads" of wires along the east side of the street and across the private way just mentioned. The west or outside lead, as it is called

1. TELEGRAPHS AND TELEPHONES: negligence: maintenance of wires: private driveways.

in the record, was just outside the fence bordering that side of the street, while the other lead was carried along inside the fence. The poles of the two lines were about 17 feet apart. The wires were carried on cross-arms, thus reducing the clear space between the two leads by several feet. Upon the outside lead, the first pole to the north of the gate on the driveway was about 12 feet distant, while the first one to the south was distant 150 feet or more. The pole on the north had been broken and reset, with the necessary result of reducing the height at which the wires were carried. There is evidence that the one to the south had also been broken off, and the pieces spliced or wired together. The wires were not all maintained at the same height, and the evidence tends to show that one, if not two, of the lower wires hung at a height variously stated as being from 11 feet, 8 inches, to 12 feet, 5 inches, from the surface of the driveway. On December 19, 1913, the deceased, who lived on the opposite side of the street, undertook to assist his son Archie in hauling hay from a point some distance in the country to the barn of the latter on the described premises. With a load of about a ton they returned, the son being in front and driving the team, while the father was about one third of the way from the rear end of the load. They had captured a wild goose on the road, and this the old man was holding down under a horse blanket. As they approached home, he was, when last noticed by his son, on his knees. As they turned into the driveway, and just as they reached the outside lead of wires, the deceased called to his son to look out for them. The son, acting from the warning or from his own view of the necessity, says: "I ducked down and went under them." Then he says: "I heard some kind of a noise; I don't know whether he made it or where it came from. I looked back and he was gone." The witness says that he himself was then under the inside lead. The father was found on the ground in the driveway behind the load. He was dead or in a dying condition, with his skull crushed.

The plaintiff charges that the death of his intestate was caused by the negligence of the defendant in maintaining its wires at an insufficient height to avoid travel upon the driveway; in failing to comply with the ordinance of the city of Hampton requiring such wires to be placed at a height of not less than 22 feet above the ground; in failing to replace broken poles with others of proper height; in the manner of fastening or supporting the wires; and in allowing its wires to sag or sink below the proper elevation. The defendant's answer is a denial of all the allegations of the petition.

At the close of the testimony, the court having refused a motion to direct a verdict for defendant, the issues were submitted to the jury, which returned a verdict in plaintiff's favor for $3,000. From the judgment entered on this verdict, the defendant appeals.

I.  While not admitting the charge of negligence, counsel for appellant do not seriously contend that the evidence upon this point was insufficient to go to the jury; and, without taking time to go into details, we may say that it very clearly appears that, either from fault in original construction or in the manner of its maintenance, the outside lead of wires was a menace to those using the driveway, and especially to those riding along such way upon loads of bulky materials. At least, the evidence would justify such finding, as well as the further finding that ordinary care in constructing and maintaining this lead would have remedied that defect.

II.  But the defense upon which the greatest reliance seems to be placed is that, even if such negligence be proved, plaintiff has failed to show that the death of the intestate was in any manner attributable thereto.

2. NEGLIGENCE: proximate cause: degree and manner of proof: negativing causes.  First, it is said that no witness saw the wire strike deceased and sweep him from the load, and that the allegation that any such collision took place is a mere unsupported inference. Upon this question, we will briefly refer to the evidence. In addition to the testimony of Archie Bonjour,

already mentioned, there were other witnesses in,the vicinity at the time of the accident.

H. Fredericks was passing near by, and saw the position of the deceased just before the accident, but did not see him fall. The deceased, when witness saw him, was ''sitting on his feet,'' about five feet from the rear end of the load.

Albert Fredericks saw the deceased fall; saw him come backwards off the load of hay; saw him ''go down head first and slid on his back.'' The last witness noticed deceased before his fall; he was ''kneeling or squatting down—sitting on his heels,'' with his face to the front, and about ''three or four feet from the back end of the load.'' He thinks deceased was east of the west line of wires when he fell.

Ed Fredericks was some 10 or 15 rods away. He testifies:

''Mr. Bonjour was kneeling, sitting on his heels about four feet from the rear end of the load. I took no particular notice until I saw him pitch off backwards. I saw them turn into the gateway and saw the old man kind of reach forward as though he was going to put the pitchfork down, and the next thing I saw him going off backward. He just pitched over and went down head first. He had his face toward the front and at the time he pitched over his face was up. I didn't see him stand up at any time.''

On cross-examination, this witness says that he saw the deceased and his son as they turned into the gateway, and saw them continuously until the old man pitched off. He adds:

''The father was sitting on his heels. He remained that way so far as I know until I saw him fall backwards. He reached forward as though he was going to push a fork down in the hay or something. I didn't notice any fork in front of him. He just leaned forward and put out his hand. He just reached out like that just before he went under the wire. Next thing I saw was when he just went over backwards. His hands were sticking out like that.''

The witness Stonebreaker, a rural mail carrier, was also

approaching on the highway, some 15 rods distant. He says:

"When I first saw them, I should judge Mr. Bonjour was on his knees. . . . He was about a third of the way from the rear end of the load; Archie was in front. I was looking directly at them at the time of the accident. I didn't see them turn in. I looked just as they had gone in under the first lead wire. I thought it was the first lead. I couldn't see the lower wires at that time. I didn't know they were there, but about where the—the wire on that cross-arm or insulator at the top, he went under those. Just as he got under them it looked to me as though—the two leads were about four feet apart that time—it looked to me as though he raised up there and commenced grabbing with his hands and he went right off the hind end of the wagon onto the ground, grabbing all the way down to the ground. He went down head first, straight as an arrow, waving both hands; he was turned completely over. . . . It didn't seem to me that he was stumbling or slipping off the load at any time. I didn't take particular notice of the wires at that time."

The witness further says that, owing to the distance and the darkness of the day, he could not see the wires over the driveway. The evidence also tends to show that the lower wires on the outside lead cleared the top of the standard of the hayrack on which deceased was riding by a space of less than a foot, and that the driver, sitting or standing in front where the binding pole would naturally compress the hay lower than at a point farther back, was required to stoop to pass under the wires. Again, two or three witnesses swear that, after the accident, the two lower wires were found tangled or twisted together.

With this evidence, most of which is undisputed, it is certainly not surprising that the jury found that deceased met his death by being thrown or swept from the load of hay by the low hanging wires. Indeed, assuming the witnesses to have told the truth as they saw it, that conclusion is inevitable. Counsel, appreciating the situation, have assumed the

burden of demonstrating by appeal to mathematics and the science of physics that the witnesses either testify falsely or are radically mistaken with reference to the cause of the accident, and that it is impossible that deceased should have been thrown to his death by contact or collision with the wires of the outside lead. This is based upon the fact that the evidence tends to show that the body of deceased, when approached after his fall, lay with head to the east and feet to the west, the head being approximately seven feet east of a point directly under the wire with which it is claimed that he came into collision. To negative the possibility that the body could have fallen thus, we are cited to Newton's Third Law of Motion, Lommel's Experimental Physics, and the mathematical tables and charts made use of in electrical construction, and, after applying them to appellant's theory of the facts, the argument reaches a conclusion which we quote from the brief as follows:

"*It follows that Mr. Bonjour, if he had been struck by the telephone wire, would have fallen with his head either directly under the wire, or at least quite close to a point directly under the wire.* Now examine the contention that he rotated slightly, with his hips as the axis of rotation. Then, while he was being pulled off (assuming, for present purposes, that he was), his head would at all times have remained where the wire was, or directly under it (because either in contact with the wire, or else, after leaving it, moving to the west with a greater velocity than that of the wagon to the east, and hence remaining under or west of the wire), and his hips therefore could at no time after the falling commenced have been *more* than a couple of feet east of the wire, and probably considerably less. And since, after the balance was overcome, the eastward motion was neutralized, his hips would remain in that position, or move slightly to the west while falling, so that his hips could not at any time have ever been *more* than a foot or a little more east of the wire during the course of the supposed fall. Assume, therefore, that a rotation took place,

with the hips as the axis of rotation, still this rotation was shown by the evidence to have been only a quarter revolution, since he did not spin through the air but fell straight over backward and straight to the ground, head downward. Being then only a quarter revolution, it would follow that, though you assume that the hips fell in a line a couple of feet east of the wire and that the body went through this quarter revolution with the hips as an axis, it follows that the head could only have hit the ground under the line which the hips would describe in falling to the ground, *or not more than a couple of feet east of the wire, at the very most.*"

The court is not rash enough to attempt the repeal of any law of nature, nor will it (if it knows it) permit a jury to do so, but it cannot shut its eyes to the fact, which is open to common observation, that there is often a wide and ineffaceable margin between pure science and applied science, and that, while a scientific truth remains immutable, the variety of circumstances affecting its application to human affairs tends to produce variety of results. It would seem a reasonable proposition that, before attempting to speak with certainty as to just how the laws of motion or the law of gravitation or other law of nature operated or combined to efface the life of deceased, the court or jury should know with reasonable certainty the exact truth as to every condition or material circumstance which might have been a factor in the fatal result. This, it must be confessed, we do not have. True, we have the testimony of the witnesses, and as far as they go, many of them agree concerning some material circumstances; in others there is the variety of estimates and differences of observation which are inseparable from human testimony. Again, may it not reasonably be said that the degree of tension at which these wires were stretched, or the amount of slack therein, whether the wires were rigidly attached to the poles on either side, or were so loosely attached that a strain applied over the driveway would take up the slack to a considerable distance in either direction, the distance to which the wires, if any,

which entangled the deceased would be deflected to the east
before gathering force enough to pull him from the load,
whether such wire (if any) struck his person about the middle
in a manner to carry his body to the west, as assumed by
counsel, or hit him a glancing blow about the head or shoul-
ders sufficient to topple him over without carrying his weight
at all, or whether, as would seem likely from the evidence, on
suddenly realizing his peril he grasped frenziedly at the wires
and was drawn backward by the hands, were all matters which
could not be properly ignored in working out even a scientific
hypothesis of the accident, and yet, concerning them all (if we
except the last circumstance suggested), there is little or no
evidence.    There is still another circumstance appearing in
evidence vitally affecting the hypothesis of counsel.    At least
one witness testifies that, after the accident, the pole imme-
diately south of the drive was found loose and deflected to the
east, and that one of the employees of the company straight-
ened it up.    If this be true, it was a fair inference for the
jury that the pole had been carried out of its perpendicular
by the strain of the body of the deceased upon the wire.
Moreover, would not the giving way of the pole in such man-
ner materially affect the resistance of the wire, and, as well,
the effect of the law of motion cited by counsel?    In short,
it seems to us that the data that we have in the record are
entirely insufficient to enable us to say that the correct result
may be obtained upon a purely mathematical or scientific basis.
Nor can we see any compelling reason for the conclusion or
inference that, because the body of deceased lay a few feet
east of the line of the wire which is supposed to have entangled
him, his fall could not have been so produced.    He was riding
near the rear end of the load, facing east.    He was sitting or
crouched down upon his knees.    The evidence shows that, as
he passed under the wire, or instantly thereafter, he seemed
to partially arise, throwing out his hands, struggling for an
instant before he went over backward.    During that instant,
the team and wagon were moving east, and, even if he struck

the ground seven feet east of the wire, it is a reasonable inference that, in the second of time or less before his body fell from the load, the wagon had moved that distance eastward. At the very least, such finding by the jury could not be said, as a matter of law, to be without support.

III. Objection is raised that at best the death of the intestate in the manner charged is a mere possibility, not more persuasive or better supported than any one of several other possibilities, and that, under the rule relating to circumstantial evidence, plaintiff must negative the other possible causes before a recovery can be had in this case. We cannot so regard the record. The fact that no witness swears to seeing the actual contact of the wire with the body of the deceased is not decisive of the question. As with nearly every other fact pertinent to an issue triable in court, the cause of the fall and the death of the intestate may be established by circumstances, as well as by direct evidence. The circumstances which plaintiff's evidence tends to show are all consistent with the theory that deceased was thrown from the load by the telephone wire. No other theory is suggested which is equally reasonable or equally consistent with all the proved facts. The thought advanced that possibly the deceased might have been stricken with heart disease or apoplexy, though there is not the slightest evidence thereof or that he ever showed any symptoms of or tendency to such disease, is no more persuasive than would be a suggestion that he might have taken a dose of prussic acid, or have become suddenly insane and plunged from the load in a maniacal frenzy. These and other suppositions do credit to the fertility of counsel's imagination, but neither has in it any element of probability, nor has either any support whatever in the testimony; while plaintiff's case, though aided materially by circumstantial evidence, is not wholly dependent thereon. And if it were, there is still a case for the jury. To entitle him to a verdict, plaintiff is not required to negative all possible causes of his intestate's death other than defendant's negli-

gence. Nor is he required to make his case beyond reasonable doubt. If he shows a cause which might have produced an accident in the way alleged, and that the accident complained of happened in that manner, "it is to be presumed, in the absence of showing of other cause, that the one known was the operative agency in bringing it about." *Brownfield v. Chicago, R. I. & P. R. Co.*, 107 Iowa 254, 258; *Lunde v. Cudahy*, 139 Iowa 688, 701. The record does not make a case where the jury must go into the field of mere conjecture, or where it must make a choice between mere possibilities or probabilities having equal support in the proved circumstances, and it is, therefore, not obnoxious to the rule of the precedents cited by appellant.

IV. Was the deceased chargeable with contributory negligence as a matter of law? The court cannot so hold. That he was familiar with the premises and on the day before had ridden another load of hay under the wires is

3. **TELEGRAPHS AND TELEPHONES: maintenance of wires: knowledge of deceased: contributory negligence.** evidence which the jury should have considered, and we must presume did consider, on that issue; but it is insufficient ground on which to say conclusively that he was not in the exercise of reasonable care for his own

safety. So far as shown, the one prior occasion referred to was the only time that he had ridden a load through there while the wires were in that condition, and the load being drawn at that time was a smaller one. And, even though he knew that the wires were low (which he evidently did) and that he would be required to bend his body or stoop to escape them, it would not do to say, as a matter of law, that, as an ordinarily prudent man, he might not believe, and act upon the belief, that he could make the passage in safety. Nor would the mere fact that he misjudged the clear space under the wires, or the safety of the position that he assumed to make the passage, necessarily convict him of negligence. It was for the jury to determine whether he exercised reasonable care to avoid injury.

V. Complaint is made that the verdict is excessive. Deceased was 68 years of age. His children had reached maturity and gone out for themselves, and he and his wife constituted the family at home. He had a small homestead property, which he devoted to the raising of fruit. He also peddled or sold fish. He was a man of good health, good habits, industrious and economical. He had given some aid to his children. During the year preceding his death, his income was about $750 over and above his living. His expectancy of life was 10 years. While he was advanced in years, his family expenses were naturally diminished by the departure of his children to homes of their own, and it is but fair to presume that he had fair prospect of adding substantially to his estate, had he lived out his time. The verdict does not indicate that it was influenced by passion or prejudice, and we are of the opinion that it should stand.

4. TRIAL: verdicts: $3,000: excessiveness.

No ground for reversal being shown, the judgment of the district court is—*Affirmed.*

EVANS, C. J., DEEMER and PRESTON, JJ., concur.