Jennie C. Semmons, Appellant, v. National Travelers' Benefit Association, Appellee.

**INSURANCE:** Accidental Insurance—Accidental Injury and Sole
1 Cause of Death—Degree of Proof. Harmonious, consistent and related facts and circumstances may be such as to establish, *prima facie*, (a) that an injury was accidental, and (b) that such injury was the *sole* cause of death, *even though there is no expert medical testimony in support of the latter.*

PRINCIPLE APPLIED: Ice from melting snow had, during an afternoon, accumulated on five steps leading to a porch, and particularly on the top step. The insured came home after dark, and was heard to come up the walk and steps at his usual walk. When the top step was reached, the wife heard a "thud" as though a person had fallen, and a scraping sound as though the person had slid down the steps This was followed by low, continuous, monotonous talking, but no cry for help. A sound followed as though someone was crawling up the steps on his knees. The wife opened the door, and discovered the insured aimlessly walking around on the porch in a dazed condition. He was taken inside the house. He was very pale. His talk was, at first, incoherent. Later, he said he slipped on the steps and fell to the walk. No marks of injury appeared on the body. He remained conscious for two hours, then became unconscious and so remained to the time of his death, seven hours later. In the meantime, a doctor was called. There was evidence pos-

sibly tending to show that insured was then partly paralyzed, but there was no showing of any predisposition to apoplexy or paralysis. After he was taken into the house, he vomited a bloody, watery substance. He had not been well for two years prior to his death, and had quite largely given up business, but was, at all times, up and around the city. The nature or extent of his ailment did not appear. Prior to his injury on the night in question, he was in his usual health. In an action on the policy, there was no medical testimony that the fall (if he did fall) did or might have caused his death.

*Held*, the record would justify the jury in finding (a) that the injured person was "accidentally" injured, and (b) that such injury was the sole cause of death.

EVIDENCE: Presumption—Witholding Evidence. No unfavorable presumption is raised against one who fails to call physicians on the issue as to the cause of death of a party in question when such physicians are equally accessible to both parties.

*Appeal from Story District Court.*—E. M. McCall, Judge.

MONDAY, JUNE 25, 1917.

ACTION at law, brought by plaintiff as beneficiary in a certificate of membership issued by defendant to W. J. Semmons. Plaintiff claimed that deceased met his death as a result of bodily injuries effected by accidentally falling upon an icy step. Trial to a jury. At the close of plaintiff's evidence, defendant moved for a directed verdict in its favor, which was sustained. The plaintiff appeals.— *Reversed and remanded.*

*C. G. Lee*, and *I. R. Meltzer*, for appellant.

*Carr, Carr & Evans, J. Y. Luke*, and *E. H. Addison*, for appellee.

1. INSURANCE: accident insurance: accidental injury and sole cause of death: degree of proof.

PRESTON, J.—Plaintiff sought to recover $5,000 upon a certificate, claiming that assured accidentally slipped and fell violently upon an icy step on the night of February 6, 1915, which effected bodily in-

juries that resulted in his death within a few hours thereafter.

. That assured was in good standing, that he died on the date alleged, and that notice and proof of death were given, was admitted. The only question in dispute was whether the death of deceased resulted from injuries effected by accidental means. The main question is whether it was necessary, under the circumstances shown, to call medical witnesses to show that the death of deceased resulted from the injuries which he received on the evening in question. Appellee states the proposition this way: The decisive question is whether the evidence was sufficient to establish the allegation that assured's death resulted from bodily injuries "effected directly and independently of all other causes, through external, violent and accidental means." Appellee's contention is that there is no direct evidence to establish that fact, and that the circumstantial evidence is insufficient to show that the death of the assured resulted from accident. They say there may be direct evidence that deceased fell on the porch, but that the direct evidence does not show that such fall produced fatal injuries. Several separate reasons were stated in the motion to direct a verdict, but it is conceded that the real ground of the motion was that the evidence was insufficient to justify a verdict in plaintiff's favor, for the reason that the evidence fails to show that the death of the assured resulted from a bodily injury accidentally received.

The trial court adopted defendant's theory, and, in ruling upon the motion, said, in substance:

"The record is silent as to whether or not the injury which the assured received, if he received one, could have caused his death. No witness, physician or layman, has testified that his death might have resulted or could have resulted from the injury which he received, if he did re-

ceive one, that evening on the porch. It strikes me that, under the circumstances, the court could not permit a verdict to stand if one were rendered, in the absence of any showing that the cause of the death of Mr. Semmons was the injury which he received on the porch the night before his death."

The defendant also contends, and cites authority to the effect, that a theory cannot be said to be established by circumstantial evidence, even in a civil action, unless the facts relied upon are of such a nature and so related to each other that it is the only conclusion that can fairly or reasonably be drawn from them, and that it is not sufficient that they may be consistent with that theory, for that may be true and yet have no tendency to prove the theory; and many authorities are cited to the further proposition that, if other conclusions than that contended for may reasonably be drawn as to the cause of the injury, from the facts in evidence, the evidence does not support the conclusion sought to be drawn from it, etc. These legal propositions are not disputed by appellant.

The certificate provides that the association "does hereby accept W. J. Semmons * * * and does hereby insure said member * * * against loss of life, limb, sight and time resulting from bodily injuries (hereinafter called 'such injuries') effected directly and independently of all other causes through external, violent and accidental means."

It will be necessary to refer to the testimony bearing upon the point in controversy, and this we will now proceed to do as briefly as may be. There was evidence from which the jury could have found that, prior to the date in question, a heavy snow had fallen; the snow had melted to some extent on the afternoon of February 6th and that evening it turned cold, and the melted snow was turned to ice. Upon the south side of the Semmons residence was

a porch with five steps from the walk to the porch, and there were two steps from the street to the walk. There were no eaves upon the porch to which this walk and steps led. The afternoon of the 6th, the snow had been melting upon the roof of the porch and the water had been running down upon the steps; ice had formed, particularly upon the top step. On the date in question, deceased was in his usual health; he had been to a funeral that afternoon, and after the funeral he had remained down town until dinner time. After dinner he had gone down town for the mail at about 8:10 P. M. While down town, he was observed by witnesses who testify that he was then apparently in his usual health. Just before 9 o'clock that evening, he was heard by his wife coming along the street returning home. An ell of the house is located about 14 or 15 feet from the sidewalk on the street; this ell is octagon shaped, and in it were three windows. Mrs. Semmons was sitting in the octagon reading. The frozen snow and ice gave a crunching noise to footsteps. Mrs. Semmons recognized the footsteps of her husband, and that he was walking at his usual gait; she heard him come into the yard up the steps from the sidewalk to the yard walk, and up the steps to the porch until he reached the top step, when she heard a noise like a thud upon the step. A part of the testimony of plaintiff follows:

"I did not observe anything unusual about his condition when he left the house to go down town that evening. I think he left about 10 minutes past eight, and was gone more than a half hour, but I don't think quite three quarters. I think he returned 10 or 15 minutes before 9. It is 3½ blocks from our home to the post office. I know his walk and heard him coming, and he was walking about as usual, about his usual gait. The next day I observed the condition of the steps, and they were very icy. After hearing Mr. Semmons coming along Eighth Street by the

window where I was sitting, I heard him turn in and walk up the 2 steps and walk the length of the walk to the porch steps and walk up the 5 steps—up, I think, to the top step. Then there was a thud of some kind. I did not know exactly what had happened. I imagine that he came to the top step. I next heard a rattling down the steps; then I heard talking at the foot of the steps. About a week or two before this, some children had been playing upon the steps—I suppose it was children—who had left a box of little condensed milk cans sitting on the steps—there was a place at the end of the steps for the children to play. I didn't go to the door immediately, and I heard a noise on the steps as though someone—it didn't sound like footsteps; it sounded more like someone on their knees—but I could hear the weight on the ice as they were moving around, and they continued up the steps in that way, moving back and forth, a noise as someone on the ice; it didn't sound like a man's footsteps, but sounded more like a man crawling up steps. There was talking all the time in just a conversational tone, but no one was calling for help or anything of that kind. It came along up to the top of the steps. The talk continued right along, and the same noise, as though someone was going back and forth on the steps, or crawling up the steps; and when they got to the top step, I went to the door and was going to open it, and then thought I wouldn't. The talk ceased for just a moment and they were quiet, so I went to open the door, and then it seems as if someone got up to their feet, and then I heard footsteps going round and round on the porch, and then I knew something was wrong and I threw the door open. When I opened the door, Mr. Semmons stopped and put his hand out, but he wasn't reaching towards the door. I took him by the arm and led him into the house. He walked in and took off his gloves and laid them on the stand, and I believe he took his hat off himself, and then I

helped him to take off his overcoat. I asked him what was the matter, if he got hurt, and at first I couldn't understand what he said; each time he would say something that ended up with 'walk;' I couldn't understand whether he said he had walked too much or what, and I said, 'I can't understand what you say,' and then he took both hands and took hold of his leg and pushed his leg along the floor. Q. What did you say after he did that? A. I said, 'Oh, you slipped on the steps and fell to the walk?' and he said, 'Yes.' Q. Did you hear what was said by Mr. Semmons to Dr. Proctor about what happened to him? A. Yes, sir. Q. What did Mr. Semmons say? A. Dr. Proctor said, 'How did this happen—what were you doing when this came on?' Q. What did Mr. Semmons say? A. He said, 'I fell on the steps.' * * * When I opened the door and found my husband on the porch, I heard him walking, but he stopped and stood still and reached out; he did not speak outside, and I could not understand at first what he said when he first came in. He looked very pale, and looked quite dazed—I should think you would express it that way; he vomited, and it looked quite bloody, watery and bloody—not thick blood, but red like blood and water. Mr. Semmons remained conscious after he came in until after 11 o'clock. He died about 6 o'clock Sunday morning, without regaining consciousness. After he came in, he sat up long enough for me to prepare the couch."

On cross-examination, she said, among other things:

"There is a kind of a noise you would term a thud, a falling body. Q. Was that such a one as the weight of a man would make—is that what you mean? A. Yes. After I laid my paper down, I sat and listened and wondered what was going on outside. After the thud came, I heard something rattling down the steps—some noise on the steps; then I heard talking at the foot of the steps leading into

the house. Q. What did you do then? A. I still wondered; I was more surprised than ever, and couldn't understand who was talking, because I knew no one came with Mr. Semmons, and I couldn't understand who he could be talking to. The talking was in a conversational tone and just a monotone; there was no calling for help, and I thought it was strange. I knew no one came with him, and the only thing that I could think of was that these children had come down again, and it passed through my mind that he must have caught the children, and when I heard the noise which must have been him crawling up the steps, I thought it the children. Undoubtedly it was Mr. Semmons getting to his feet, because it sounded like it; the noise sounded like he was feeling his way up and crawling up the steps."

She also testified:

"I put him in the chair first and rubbed his head, and then went to the kitchen and got water and bathed his head and face, and he seemed to get better. When he came in, he was quite pale looking, and then he got so he looked more natural after I bathed him and rubbed his face. Q. Did you call a doctor? A. No. I told him to sit still in the chair and I would go upstairs and get clothes and quilts, and I did, and he took hold of the chair and moved the chair back and forth this way and brought himself to the couch, and then he got off and took hold of my arm and got on the couch. Then I called Dr. Proctor. He did not come immediately, and Mr. Semmons asked me if I had called the doctor, and I said 'Yes,' and he said, 'You better call again,' and I called again. Dr. Proctor gave him two treatments. A little bit the first time, and then went back and treated him again. This was the same evening. The doctor came within 10 or 15 minutes after we called for him, and got there very soon. The doctor came within 20 minutes after I got Mr. Semmons in the house."

It is appellant's contention that the statements by deceased and the conversation between him and others are a part of the *res gestae,* and we do not understand appellee to question this. From the evidence before set out, it is contended by appellant that the evidence was sufficient to take the case to the jury on her theory that the fall by deceased was accidental, and that. the death of deceased resulted from bodily injuries, effected directly and independently of all other causes, through external, violent and accidental means. The theory is that it is the bodily injuries and not the loss of life that must be effected directly and independently of all other causes, etc.

The evidence opposed to this, which defendant contends presents the question whether or not it was not as likely that the death of deceased was from ill health as from the injuries in the fall, is substantially this: Dr. Maxwell testified:

"I am a physician and surgeon and reside at Ames, and knew Mr. Semmons during his lifetime. * * * I knew about Mr. Semmons being ill, but I don't know how long I knew it. I knew he had been ill and had given up his business and did that on account of his health; I also knew that he had gone abroad on account of his health. I don't know how long he had been about Ames after his return from Europe and prior to his death, but I knew he had gone to Europe and come back. I saw him on the streets of Ames every few days. I would see him once or twice a week. Q. When you say you noticed nothing unusual about him (the evening before he died), you mean that he looked the same that evening as he did when you saw him other times, after his return from Europe? A. As far as I observed him. Q. Was there anything that evening that called your attention especially to him? A. No, sir. Q. Anything about his appearance that was dif-

ferent from what it had been for the past few months?   A.
No, sir.".

Plaintiff testified further:

"Q.   You knew your husband was in bad health, didn't
you?   A.   His health was not very good, but he was able
to go around all the time, never was sick a day.   He had
not been perfectly well for two years, and was as well that
night as usual.   Q.   You answered, in answering Judge
Lee, that he was not any different from usual that night;
now I will ask you what you understand his usual condi-
tion was?   A.   He was not any worse—that is, he was not
sick, or was not any better; he was about as he had been.
Q.   How had he been?   A.   He had been able to go about
his work all the time.   He got up in the morning and
went down town at eight o'clock, as he always did when
he was in business.   He had been doing some insurance,
and came home to dinner at twelve o'clock, and went down
town   in   the   afternoon   again   *   *   *.   About eleven
o'clock, Dr. Proctor called Dr. Bush, who came inside of
ten minutes and stayed until about   half   past   one.   I
heard Dr. Proctor tell Dr. Bush that Mr. Semmons was
paralyzed—that he was paralyzed partly—and he thought
perhaps bleeding him would help some, or something to
that effect."

We understand appellee to make some claim also as to
the answers to questions before set out, which are:

"Q.   What did Mr. Semmons say?   A.   Dr. Proctor
said: 'How did this happen—what were you doing when
this came on?'   Q.   What did Mr. Semmons say?   A.   He
said, 'I fell on the steps.' "

The thought is, as we understand it, that from this
question there is an inference that some trouble came on.
But it will be observed that the question is a compound
one, and the answer that deceased said he fell on the steps
could apply to the first part of the question as well as the

latter part, and we think is directly responsive to the first part of the question as to how it happened.

1. As to the first proposition: Was the evidence sufficient in connection with the declarations of deceased, to take the case to the jury on plaintiff's theory that deceased was injured accidentally, and that his death was the result of such injuries, without testimony of medical witnesses to show that fact? We think this question must be answered in the affirmative. There are cases where malpractice is charged, as in *Ewing v. Goode,* 78 Fed. 442, and Wade, Malpractice Cases, pages 503, 505, holding that, when a case concerns the highly specialized art of treating an eye for cataract, etc., with respect to which a layman can have no knowledge at all, the court and jury must depend on expert evidence. It was said also in the same case that in many cases expert testimony, though all tending one way, is not conclusive upon the court and jury, but the latter, as men of affairs, may draw their own inferences from the facts and accept or reject the statements of experts; but such cases are where the subject of discussion is on the border line between the domain of general and expert knowledge, etc. But we think the instant case is not like a malpractice case, and we are of opinion that, from the evidence in this case, the plaintiff made out at least a prima-facie case, and that the jury would have been justified in finding from the evidence that deceased was injured in a fall, and that his death was caused from such injuries. If a man is struck a severe blow on the head with a sledge hammer and the skull completely crushed in, or if a man's body is found at one side of a railroad track and his head on the other, clearly it would not be necessary to call medical witnesses to prove that such injuries would cause death. To be sure, these are extreme illustrations. We do not hold that a case could not arise where the circumstances might be such as to dispense with med-

ical testimony on the question as to whether the injuries would cause death. It has been held that, where death results within a short time after an accident, the inference may be drawn that the accident was the cause of death. *Wiese v. Remme*, 140 Mo. 289, 297, 298 (41 S. W. 797); *Railway Officials & Employees' Accident Assn. v. Coady*, 80 Ill. App. 563, 565, 566, 567, 571; *Hooper v. Standard Life & Accident Ins. Co.*, 148 S. W. 116 (166 Mo. App. 209); *Anderson v. Northern Pac. R. Co.*, 19 Wash. 340, 343 (53 Pac. 345); *Indianapolis, Peru & Chi. R. Co. v. Collingwood*, 71 Ind. 476, 477; *Same v. Thomas*, 84 Ind. 194, 197; *Pittsburgh, C., C. & St. L. R. Co. v. Hoffman*, (Ind.) 107 N. E. 315, 321; *Union Mut. Life Ins. Co. v. Buchanan*, 100 Ind. 63, 72; *Clark v. Employers' Liability Assur. Co.*, 72 Vt. 458, 461, 462, 464; *Carpenter v. Town of Rolling*, 107 Wis. 559 (83 N. W. 953); *Foster v. North American Accident Ins. Co.*, 176 Iowa 399.

We held, in *Bonjour v. Iowa Telephone Co.*, 176 Iowa 63, that, where a cause is shown which might produce an accident, and it further appears that an accident of that particular character did occur, it is a warrantable inference, in the absence of showing of other cause, that the one known was the operative agency in bringing about such result. See also *Lunde v. Cudahy Packing Co.*, 139 Iowa 688.

In *Continental Casualty Co. v. Lloyd*, 165 Ind. 52, 56, it was said that, where two or more causes contribute to an injury, where there is doubt, or the facts are of a character such that equally prudent persons would draw different conclusions therefrom, in such cases the question as to which of the contributing causes is the efficient, dominant, proximate cause is a question to be submitted to the jury. See also *Lunde v. Cudahy Packing Co.*, supra.

The following cases may be cited also to the point to sustain the proposition that appellant is not required to

offer the testimony of a physician that death could have resulted from the fall: *Wiese v. Remme,* 140 Mo. 289, 297 (41 S. W. 797) ; *Anderson v. Northern Pac. R. Co.,* 53 Pac. 345; *Carpenter v. Town of Rolling,* (Wis.) 83 N. W. 955; *Clark v. Ins. Co.,* 72 Vt. 458

There is some evidence, it is true, that deceased had not been in good health for some time prior to his death, but the character of his indisposition is not disclosed by the record. Certainly it is not shown that there was any predisposition to apoplexy or paralysis. We think it is a matter of such common knowledge that a jury could prop- erly so say, that a person receiving a fall might be dazed or possibly paralyzed. We think it cannot be said as a matter of law that the ill health of deceased is equally rea- sonable, or equally consistent with the theory that deceased was injured by a fall and that his death resulted therefrom. At most, under the circumstances shown, if it be thought that the ill health of deceased was the cause of his death, still, under the authorities before cited, it was a question for the jury as to which of the two alleged causes was the cause of death. It should have been stated that the evi- dence does not disclose that there were any marks on the deceased's person, but, among other circumstances, it is shown that deceased turned pale; that he was dazed; that he vomited a watery, bloody substance; and the like.

2. EVIDENCE: presumption : withholding evidence.

It is contended by appellee, and au- thorities are cited in support of the propo- sition, that, because appellant did not pro- duce the testimony of the physicians and in- quire of them as to the cause of death, there is a presump- tion against appellant that such testimony, if produced, would be adverse to her. But we think the rule does not apply under the circumstances here shown. Under the facts of this case, we see no reason why plaintiff should be required to use all the testimony she may have, since

we hold she made a prima-facie case without the introduction of such testimony. The testimony of the doctors here was not peculiarly within the control of appellant, neither did she prevent the use of such testimony.

For the reasons stated, it is our conclusion that the trial court erred in directing a verdict for the defendant. The cause is therefore reversed and remanded for trial.— *Reversed.* •

GAYNOR, C. J., WEAVER and STEVENS, JJ., concur.