**Ivan A. MARTIN, Plaintiff-Appellant,**

v

**FIRST NATIONAL OF INDEPENDENCE COMPANY, Defendant-Appellant.**

**No. 49687.**

Supreme Court of Missouri,
Division No. 2.

Nov. 11, 1963.

Motion for Rehearing or to Transfer to Court En Banc or to Modify Opinion Denied Dec. 9, 1963.

Thaine Q. Blumer, Kansas City, Blumer & Wright, Kansas City, of counsel, for plaintiff-appellant.

Roy A. Larson, Jr., Kansas City, Sprinkle, Carter, Sprinkle & Larson, Kansas City, of counsel, for defendant-appellant.

STORCKMAN, Presiding Judge.

This is an action for personal injuries sustained by the plaintiff while working for a subcontractor in a building which was undergoing alterations under a construction contract made by the owner with a general contractor. The earlier petitions had joined as defendants the general contractor and a subcontractor, other than of plaintiff's employer, but in the third amended petition on which the case was tried the only defendants were the building owner and its principal tenant. First National of Independence Company was the owner of the building, and First National Bank of Independence was the tenant of the first three floors of the building, the upper floors of which consisted of offices rented to others. The trial court directed a verdict in favor of the Bank at the close of plaintiff's case from which judgment the plaintiff appealed; however, the plaintiff voluntarily dismissed that appeal before it was briefed and submitted in this court. The plaintiff obtained a judgment for $25,000 against the owner, First National of Independence Company, from which both parties have appealed. These cross-appeals are the ones with which we are now concerned. The plaintiff contends that the judgment should be

amended by adding to it $12,212 which is the amount of Workmen's Compensation benefits paid the plaintiff by his employer, or that a new trial should be granted on the issue of damages alone. On the other hand, the defendant building owner contends the plaintiff failed to make a submissible case and that the judgment should be reversed outright or a new trial should be granted because of trial errors. The owner of the building which is the only remaining defendant will sometimes be referred to as the Independence Company.

The defendant Independence Company, organized under the General Business Corporation Act of Missouri, owned the building in question which is located at 129 West Lexington Street in the City of Independence. In July 1956 the Independence Company entered into a general contract with J. E. Dunn Construction Company for extensive alterations and remodeling of the building in accordance with the drawings and specifications prepared by A. Moorman & Company, architects; the general contractor agreed to furnish all the materials and perform all the work required by the contract for the sum of $320,866. It appears that the alteration work primarily dealt with the three floors occupied by the Bank; that is, the first basement or Liberty Street level, the first floor, and the mezzanine floor. Some alterations were also made in the subbasement which housed the heating and cooling equipment and which was used by the janitors in connection with the maintenance and service of the building, such as burning and disposing of refuse from the offices of doctors and others.

Norman Atkins, the local representative of the architectural firm in charge of the construction work, identified a mechanical drawing of the subbasement which showed six pipes to be installed new or rerouted. According to the plans, a 3-inch waste stack was to be replaced with a 4-inch soil pipe, a 1½-inch hot water riser was to be rerouted, a new 2½-inch cold water riser was to be installed, a 2½-inch steam riser was to be rerouted, a 1-inch steam return pipe

was to be rerouted, and a new 2-inch steam riser was to be installed. Among the subcontracts let by J. E. Dunn Construction Company was one to the Kansas City Insulation Company for covering all hot and cold pipes in the building with insulating materials, including those in the subbasement. John J. Malvan was an asbestos worker employed by Kansas City Insulation Company and the plaintiff was his helper.

In order to run the pipes to the upper floors of the building, additional openings had to be cut and changes made in the southeast corner of the building from the subbasement all the way up through three concrete floor levels, and jackhammers were used to drill and break out the concrete. Mr. Malvan testified the hole in the southeast corner of the subbasement ceiling was 8 to 12 inches across and there were times when he could see daylight through it. Mr. Atkins testified the opening made was 2 to 2½ feet long. After the various pipes called for by the plans were in place, all of them except the waste lines were insulated by employees of the Kansas City Insulation Company. Mr. Malvan and the plaintiff worked on the upper floors for two or three weeks and during that time Mr. Malvan saw pieces of broken concrete in the shaft where he was insulating pipes. Mr. Malvan and the plaintiff had been working in the subbasement two or three days when the accident happened. Several overhead pipes ran north and south and several east and west in the southeast corner of the subbasement, the lowest of which were 10 feet 4 inches from the floor. There was a heater in the southeast corner on a base 5 feet 3 inches north and south by 4 feet 6 inches east and west. The east side of the base was 3 feet 9 inches from the east wall of the subbasement and the south edge of the heater base was 2½ feet from the south wall. The plaintiff was standing south of the heater base and east of a large pipe that came from the heater and turned upward to a large duct. The pipe was about 14 inches in diameter and its under side was 5 feet 10 inches from the floor. A box

of insulating material was on the floor beside the plaintiff. Mr. Malvan was standing atop the heater applying the insulating material to the pipes, which material the plaintiff handed him as requested.

Shortly after lunch on June 30, 1958, Mr. Malvan heard a noise of something falling and a sound came from the plaintiff. Looking down he saw the plaintiff in a crouched position holding his head. He got down from the top of the heater and went to the plaintiff, but the plaintiff was unable to speak to him and was bleeding from the top of the head. There was a piece of concrete on the floor near the plaintiff about the size of Mr. Malvan's fist. Mr. Malvan first testfied the chunk looked as if it had blood on it and later said it felt moist, but he was unable to describe it further. He cast the piece aside and it was not seen again. Mr. Malvan rendered first aid and then took the plaintiff to a hospital where he was examined. No fracture was found but two stitches were taken in the wound and other medication was rendered. The plaintiff left the hospital in about two hours but it was too late to report for work that day. He returned to work the next day and after working a day or two he was discharged by the Kansas City Insulation Company. Later he developed headaches and some symptoms of paralysis on his right side and on two other occasions was confined to a hospital for examination and treatment. He has not worked since his employment was terminated with the insulation company. The nature and extent of his injuries are not in controversy here and need not be further developed. Mr. Malvan and the plaintiff were the only persons present when the plaintiff was injured. Their testimony will be referred to in further detail after a statement of the issues presented at the trial.

The allegation of negligence in the third amended petition is as follows: "2. That on June 30, 1958, plaintiff was engaged in the performance of his work in the basement of said premises at 129 West Lexington, Independence, Missouri, when a piece of concrete lodged in the pipes of the ceiling of said basement fell and struck the plaintiff on the head, * * * which piece of concrete was caused to fall by the carelessness and negligence of the defendants in causing, allowing and permitting said piece of concrete to be and remain among said pipes."

The plaintiff's verdict-directing instruction was also on the res ipsa loquitur theory of negligence. It hypothesized that if the jury believed that "while standing near the southeast corner of said sub-basement he was struck on the head by a piece of falling concrete, * * * and that said piece of concrete fell from the pipes near the ceiling" and plaintiff was injured, that such facts were sufficient circumstantial evidence to warrant a finding that the defendant was negligent unless the jury found from other facts and circumstances in evidence that the occurrence was not due to defendant's negligence.

The defendant concedes that the plaintiff occupied the status of a business visitor or invitee on the defendant's premises. This court in Harbourn v. Katz Drug Co., Mo., 318 S.W.2d 226, 228 [1], approved the statement of the conditions under which the possessor of land was liable to a business visitor as set out in Restatement of the Law of Torts, Vol. II, § 343, as follows: "A possessor of land is subject to liability for bodily harm caused to business visitors by a natural or artificial condition thereon if, but only if, he (a) knows, or by the exercise of reasonable care could discover, the condition which, if known to him, he should realize as involving an unreasonable risk to them, and (b) has no reason to believe that they will discover the condition or realize the risk involved therein, and (c) invites or permits them to enter or remain upon the land without exercising reasonable care (i) to make the condition reasonably safe, or (ii) to give a warning adequate to enable them to avoid the harm without relinquishing any of the services which they

are entitled to receive, if the possessor is a public utility." To the same effect, see Streicher v. Mercantile Trust Co., Mo., 31 S.W.2d 1065, 1068 [4], and Stein v. Battenfeld Oil & Grease Co., 327 Mo. 804, 39 S.W. 2d 345, 351 [13].

The cases cited by plaintiff do not prescribe a standard different from that mentioned above. Thus in Kiehling v. Humes-Deal Co., Mo.App., 16 S.W.2d 637, the *general contractor* engaged in constructing a building was held liable to a subcontractor's employee who tripped over a wire loop embedded in a concrete floor on the theory the builder was in possession and control of the premises and under a duty to furnish a safe place to work for the subcontractor's employees. The general contractor was in charge of the activity which produced the unsafe condition. In McDonnell Aircraft Corp. v. Hartman-Hanks-Walsh Painting Co., Mo., 323 S.W.2d 788, the plant owner was held to owe a non-delegable duty to warn an employee of a painting contractor of the presence of exposed electrical wiring which was unknown to the employee although the painting contractor had expressly agreed to give the warning. This was a dangerous condition known to the plant owner and for which it was responsible. Two other cases involved injuries to pedestrians on public streets who were struck by objects which fell from buildings. See Neal v. 12th & Grand Avenue Bldg. Co., 228 Mo.App. 536, 70 S.W.2d 136, and Cooper v. 804 Grand Bldg. Corp., Mo., 257 S.W.2d 649. These are unique as are the falling elevator cases. See 65 C.J.S. Negligence § 79.

The plaintiff asserts that the defendant as owner had charge of remodeling the building; that "the evidence showed defendant to have control" of the subbasement; and that although the defendant "did not inspect the building, it did examine the work of the workmen after they left the premises." The evidence was that the defendant made examinations to see that "the building itself was secure from the outside and there was no opening or access to the building as a result of the construction", but that it made no inspections of the construction work being done in the building. The claim that the defendant had control of the subbasement depends largely on the fact that the defendant used the subbasement in connection with the operation and maintenance of the building which continued to be occupied by its tenants during the reconstruction.

■  As a general rule where an owner of property employs a builder to do construction work for a stipulated price and retains no power to direct the manner of doing the work or the right to control the builder in the performance of the contract, such builder is an independent contractor for whose negligent acts the owner is not liable. Williamson v. Southwestern Bell Tel. Co., Mo., 265 S.W.2d 354, 358 [3]; Mattan v. Hoover Co., 350 Mo. 506, 166 S.W.2d 557, 564 [6]; Southwestern Bell Tel. Co. v. Rawlings Mfg. Co., Mo.App., 359 S.W.2d 393, 398 [2]; Wiese v. Remme, 140 Mo. 289, 41 S.W. 797, 799 [2]; City of Independence v. Slack, 134 Mo. 66, 34 S.W. 1094, 1095 [1]. See also Restatement of the Law, Second, Agency 2d, § 2(3) and Comment b, and 65 C.J.S. Negligence § 92b.

■■  The employer of an independent contractor does not become liable as a principal because he engages an architect to supervise the work and see that it is done according to the construction contract. Williamson v. Southwestern Bell Tel. Co., Mo., 265 S.W.2d 354, 358 [4]; Jackson v. Butler, 249 Mo. 342, 155 S.W. 1071, 1078 [11]; Crenshaw v. Ullman, 113 Mo. 633, 20 S.W. 1077, 1078 [4]; Stanley v. Louisiana Pure Ice & Supply Co., Mo.App., 279 S.W. 157, 160 [2]. Ordinarily the owner of premises is not required to inspect the work of an independent contractor to determine whether the work is being done in a way that will provide a safe place for the contractor's employees to work. Mc-Hugh v. National Lead Co., Eastern Dist., D.C.Mo., 60 F.Supp. 17, 23 [15]; 65 C.J.S. Negligence § 50, n. 13. This requires a

further examination of the evidence to determine if there is substantial evidence that the injury was caused by a condition of the premises for which the defendant was responsible.

The evidence indicates that the shaft or opening for the vertical pipes extended from the subbasement to the mezzanine floor and had been cut through the concrete floors in the southeast corner within the period of a month before the accident happened. The plaintiff was not directly under the shaft or opening when he was injured but was standing about 5 feet west of it and facing west. He testified the lighting was not good in the subbasement, but it did not interfere with his work and was better down where he was than up where Mr. Malvan was working. Mr. Malvan and the plaintiff were alone in the subbasement when the accident happened but other workmen were on the floors above. The plaintiff had stooped over to get a piece of insulating material when something struck him and the next he knew Mr. Malvan had him at a faucet washing his head. He did not see what hit him or where it came from.

Mr. Malvan's testimony in this regard (including affirmances as true testimony given on deposition) was in substance that he was on top of the heater when he heard a noise of something falling that "sounded like material, or just pieces of concrete falling"; he had heard it many different times; then he heard the plaintiff hollering; three or four days before the accident he had gone up above in the bank building and put insulation on the risers and dropped them down as far as he could but "the holes were filled with broken concrete"; he had heard the holes being dug in the floor with jackhammers; immediately before the plaintiff was hit, Malvan heard a noise which sounded like something had fallen; he did not know where it fell from; he heard a noise and heard something slide and then hit the pipe below; he imagined it came from the shaft because he had to clear some of the debris from the shaft to lower his material down to the ell below the ceiling when he was working on the first floor; he "heard the noise of something heavy falling through the shaft and hitting a pipe and then dropping"; there is no pipe that is absolutely stationary and they all give somewhat from the application of insulating materials; he joggled the pipes prior to the time this concrete fell; he surmised that the piece of concrete came from the shaft but he did not know definitely; he had seen pieces of concrete in shafts and other parts of the building; he did not know definitely where this piece of concrete came from and his attention was first attracted to it when he heard it hitting the pipes; it did not hit the pipe he was holding onto because he could have felt the vibration; he was working on the pipes that ran north and south but he did not really recall if the plaintiff was standing under those lines; on previous occasions he had seen workmen jackhammering upstairs and down into the boiler room; he heard something falling through the shaft and then it hit; it was a piece of concrete.

The plaintiff's pleading is that the piece of concrete was "lodged in the pipes of the ceiling" of the basement and was permitted and allowed to remain among said pipes. The verdict-directing instruction also hypothesizes "that said piece of concrete fell from the pipes near the ceiling". But there is no evidence that the piece of concrete lodged on the ceiling pipes or remained there any appreciable time. There is no substantial evidence on which an inference could be based that the piece of concrete came from any source other than the construction work in progress in the building and more particularly the breaking out of the concrete floors and ceilings in the southeast corner. There is no evidence that would justify an inference that the defendant had control of this activity.

Generally the res ipsa loquitur doctrine only applies when: (a) the occurrence resulting in injury was such as does not ordinarily happen if those in charge use due

care; (b) the instrumentalities involved were under the management and control of the defendant; (c) and the defendant possesses superior knowledge or means of information as to the cause of the occurrence. Layton v. Palmer, Mo., 309 S.W.2d 561, 564 [2]; Shafer v. Southwestern Bell Tel. Co., Mo., 295 S.W.2d 109, 112 [4]; Hall v. Lewis, 364 Mo. 1096, 272 S.W.2d 260, 261 [1]; Cantley v. Missouri-Kansas-Texas R. Co., 353 Mo. 605, 183 S.W.2d 123, 130 [11]. The instrumentality that inflicted the injury in this case was a piece of concrete and the only substantial evidence of its origin is that it resulted from the breaking through the concrete floors by either the general contractor or a subcontractor. No special circumstances have been shown which would make the building owner liable for the negligent acts of an independent contractor. The construction activity was not under the control of the defendant, and the mere fact that the defendant continued to use the subbasement in connection with the operation of the building cannot be said to be the actual or constructive control of the instrumentality which produced the injury in this case. No employee of the defendant was present in the subbasement where the plaintiff and Mr. Malvan were insulating the pipes.

■ Viewed most favorable to the plaintiff and with the benefit of all permissible inferences, the evidence does not justify a submission under the res ipsa loquitur theory of negligence. The defendant's motion for a judgment in its favor should have been granted.

The conclusion we have reached makes it unnecessary to consider other allegations of error and also disposes of the plaintiff's appeal. There are no circumstances justifying a remand of the case because under the evidence there is no theory upon which liability could be established against the present defendant. The general contractor, J. E. Dunn Construction Company, and the subcontractor for the air conditioning system, Natkin & Company, were joined as defendants in the original and the first amended petitions but were omitted as defendants from the second amended and later petitions. It appears that the plaintiff has had his opportunity for recourse against all possible defendants and on all possible theories.

Accordingly the judgment is reversed.

All of the Judges concur.