Walter William BOLLMAN, Jr., by His Next Friend, Betty Lou Sanderson, Respondent,

v.

KARK RENDERING PLANT, a Missouri Corporation, Appellant.

No. 52216.

Supreme Court of Missouri, Division No. 1.

July 10, 1967.

Motion for Rehearing or to Transfer Cause from Division to Court en Banc Denied Sept. 11, 1967.

Downs & Pierce, St. Joseph, for respondent.

J. F. Allebach, Albany, Pickett, Andereck & Hauck, by Eugene E. Andereck, Trenton, for appellant.

HOUSER, Commissioner.

Walter William Bollman, Jr., a minor, filed suit pro ami against Kark Rendering Plant for personal injuries allegedly sustained as a result of negligent failure to install guards to cover the working parts of a winch on defendant's premises or to warn plaintiff of the known dangerous condition. A trial jury rendered a verdict for plaintiff for $37,500. Kark has appealed from the judgment entered upon the verdict.

The petition charged that plaintiff was on defendant's premises assisting his father in unloading dead animals from his father's truck into the plant; that plaintiff was using a winch installed by defendant for the purpose of such unloading and that while so engaged plaintiff's right hand became caught in the working gears and apparatus of the winch, which was unsafe as above specified. Kark's answer denied that it owed any duty to plaintiff and alleged that plaintiff was on the premises as a volunteer for his own purposes only and not for the benefit, pleasure or convenience of defendant; that in any event plaintiff's injuries were caused by plaintiff in that the winch, gears, etc. were plainly visible and obvious and as well known to plaintiff as to defendant.

We state the evidence from the standpoint most favorable to the prevailing party. Plaintiff, 13 years, 10 months of age and weighing 82 pounds at the time of the casualty, was a student at a special education school for children who learn more slowly than most children. He was doing school work at the 3rd or 4th grade level. He showed more ability in manual skills than in academic skills. He lived with his mother, who was divorced from his father, Walter William Bollman, Sr. We will refer to the father as Senior and the son as Junior. Senior's business was buying, collecting and selling dead animals and offal to rendering plants. He owned a truck which he used for this purpose. He had Kark's permission to make deliveries to the plant and the right to use the winch at any time of the day or night, whether or not Kark employees were present. If no Kark employees were on hand when he arrived he would open the door, attach a cable to a carcass, turn on the electric motor which operated the winch, engage the gears and wind up the cable on a revolving drum. By this method the carcasses were dragged from the bed of the truck into the plant and onto the 30 x 40 foot plant floor. For 2 or 3 years prior to the casualty Senior had been delivering dead stock to Kark's plant once or twice a day and using the winch in question. Sometimes when plant employees were there and not otherwise occupied they would help Senior unload. If they were busy doing something else, or if Senior arrived when Kark employees were off duty, Senior would unload by himself, without assistance. Senior performed this operation alone about half the time. When Kark employees assisted it was done as a courtesy, to save him time. Senior was an independent contractor, not an employee of Kark. He was paid by the hundredweight. The delivery of dead animals to be rendered at the plant was beneficial and to the economic advantage of Kark, indeed was essential to the operation of the business.

Junior had assisted Senior in unloading dead animals at the plant 15 or 20 times. In the manager's presence Junior had helped his father "take boxes of bones and

stuff" and put them on the tailgate of the truck, from which Senior would take them into the plant. Every once in a while Junior would take a box, if it was small, over by the switch near the south wall. Junior had "seen the grown men and fellows around there working that winch," and had seen Ralph Stamper's 15-year-old son on the rendering plant floor, helping Mr. Stamper. Kark's manager had seen Junior at the plant a couple of dozen times, always accompanied by his father. He had seen Junior "right inside the door," on the rendering floor. Although the manager said that he had never seen Junior doing any work in the plant, he knew that in that county boys help their fathers with their chores. Kark's manager had talked to Junior but had never "run [Junior] out" or told him to stay away from the plant. Junior was not paid a "salary." Senior did not "hire" Junior as a worker, in the conventional sense. His father "paid" Junior by giving him money "to buy models and stuff" (his hobby was little model cars, of which he had about forty) but the father also gave his son gifts at times when he did not ride on the truck.

Junior was injured on Washington's birthday, 1965. Because of the holiday Junior was not in school. He was visiting his father that day. When Junior told Senior that he was supposed to return to his mother's home by 3 p. m. his father called his mother and asked her if the boy could go with him out to the plant. She agreed. That day Junior "helped" Senior go around and pick up dead animals. After they had accumulated a load of dead stock and offal Senior drove the truck to the rendering plant, arriving after dark. Kark's employees had left the plant. After weighing the loaded truck on the scales Senior went into the basement, turned on the lights, went upstairs, opened the door at the loading dock and backed the truck to the dock. Junior had remained in the truck. As Senior pulled down the tailgate Junior asked if he could run the winch, and Senior said "Okay." Junior had never previously

operated the winch, but he knew how by having observed grown-ups operate it. There was also a winch on Senior's truck which Junior knew how to operate.

The winch at the plant was located at the east side of the room. It was operated by an electric motor. The electric switch which turned the motor on and off was located on the south wall of the room, 30 feet from the winch. The switch was also 30 feet distant from the unloading dock on the west side of the room. The winch mechanism consisted of an electric motor, a gear box, a model A transmission with a gear shift (no clutch) and a drum. When the motor was turned on a chain drive started to revolve. The main gear was engaged by pushing the idling gear by hand. The transmisssion gear shift lever was then moved to engage the transmission. The main gear turned the idling gear, which turned the drum gear, which caused the drum to revolve. The revolving drum wound up the winch cable, which was attached to the carcasses which in turn were pulled from the truck bed onto the plant floor. The transmission gear shift was then disengaged, the gears stopped, and the idling gear slipped out (by hand), thus letting the drum turn freely. The cable was then pulled back to hook onto the next carcass, and the operation would be repeated. If the gear shift lever was moved to engage the transmission without first setting the idling gear the main gear would turn but the drum gear and drum would not turn. The gears could be stopped by disengaging the gear shift, without first turning off the electric switch.

There were no guards or warning signs on the machinery. Neither Senior nor Junior had been warned by Kark's manager about the machinery. There were no instructions on how to operate the winch. An expert testified that the winch did not meet the state's minimum safety standards because it had no cover over the gears to guard them. It was also unsafe because there was no switch immediately in the area of the machinery to stop it in case

of emergency. An operator caught in the machinery could not turn off the electric motor because of the position of the switch, 30 feet away. The winch could have been properly guarded so as to have made it impossible for an operator to injure himself, at a cost of $25.

When Senior gave Junior his "Okay" Junior went across the room to the winch. Senior turned on the switch. The electric motor started. Junior knew how to work the winch from having watched the grown men operate it, and knew that the winch was dangerous. The plant was lighted. Junior's eyesight was good. He had no physical defects. He said that he was not confused. The motor started the chain to run but did not activate the gears. Instead of first setting the idling gear Junior shifted the transmission gear shift lever. This started the main gear moving, but did not start the gear on the drum or the drum to move. Junior saw that the idling gear was not engaged. Without disengaging the transmission gear he reached his gloved right hand down and pushed the idling gear which was not moving, against the main gear which was moving. Junior had seen Kark employees move the idling gear back and forth with their right hands. He testified that he ran the winch just as he had seen the Kark people doing it. When he pushed the idling gear over into gear with his hand he knew that the gears were moving and dangerous; knew and was aware that it was possible to get caught in them and get hurt. He testified that his hand "must have been caught, somehow" and he was pulled into the machinery. After his hand was caught in the gears he was unable to reach the gearshift lever to stop the moving gears. As a result his right hand and lower arm had to be amputated between wrist and elbow and he lost skin and underlying tissue on his right hip and thigh.

The first question is that of the status of plaintiff while at and on Kark's premises and what legal duty Kark owed him. Kark claims that having been guilty of no active or affirmative negligence it owed plaintiff no duty of ordinary care because plaintiff was a trespasser, volunteer or mere li-censee.

■ There can be no doubt that Senior, an independent contractor having Kark's permission to use its facilities, including the winch, was a business invitee of Kark to whom Kark, as owner-occupier, owed the duty to have its plant building and facilities in reasonably safe condition. This duty extends to the employees of an independent contractor who are on the premises prosecuting the work of the independent contractor. As to them the landowner owes a nondelegable duty to exercise ordinary care for their safety. Schneider v. Southwestern Bell Tel. Co., Mo.App., 354 S.W.2d 315, 318; McDonnell Aircraft Corp. v. Hartman-Hanks-Walsh Painting Co., Mo.Sup., 323 S.W.2d 788, 794; Ryan v. St. Louis Transit Co., 190 Mo. 621, 89 S.W. 865; Szofran v. Century Electric Co., Mo.App., 255 S.W.2d 443. See Prosser on Torts, 2d Ed., 374, note 6. Note also 57 C.J.S. Master and Servant § 604, which attests to the liability of a contractee to the employees of an independent contractor for injuries resulting from an *unsafe appliance or instrumentality* furnished by the contractee.

■ Was Junior an "employee" of Senior? A servant has been defined as "one who serves, or does service, voluntary or involuntary; a person who is employed by another for menial offices or for other labor, and is subject to his command; a person who labors or exerts himself for the benefit of another, his master or employer; a subordinate helper." 3 Bouvier's Law Dictionary, pp. 3047, 3048. There is nothing to prevent a father and his son from entering into a contract of employment. 67 C.J.S. Parent and Child § 38; 98 C.J.S. Work and Labor § 17. Payment for the servant's services is not an essential element; the relationship of master and servant may exist although the servant neither expects nor is entitled to compensa-

tion. LaJoie v. Rossi, 225 Mo.App. 651, 37 S.W.2d 684, 687.

Notwithstanding Junior worked for Senior only occasionally, was not "hired" in the usual sense of the term, and actually received no wages for his work, sufficient elements were present to form the basis of a jury finding that the relationship of master and servant existed between them at the time and place in question; and that Junior was an invitee of Kark when injured. On the day in question, by mutual agreement, Junior accompanied Senior on his rounds, picking up carcasses and offal, helping and assisting him; performing personal services under his direction and control. Senior had the right to control and did control Junior's physical activities and conduct in the performance of the services. This most important element of the relationship existed. The operation was more efficient and time was saved if one person operated the winch and another hooked and unhooked the cable. Junior's operation of the winch would have benefited Senior. When Junior undertook to run the winch he was acting with the consent of Senior, for and on behalf of Senior, in the performance of a function which Kark had authorized, encouraged and expected Senior to perform. The operation of the winch was necessary, useful and beneficial to Kark. Junior's operation of the winch would have benefited Kark. Considered in the light most favorable to plaintiff, it is reasonable to conclude that Kark's manager knew or should have known that sometimes boys helped their fathers perform work on the premises, that for some time Junior had been performing minor services and rendering some assistance to his father at the plant, by unloading boxes of offal, bones, etc. from Senior's truck into the plant, and that Kark's manager had acquiesced therein. He did not remonstrate with Junior or rule out his entry into the plant to assist his father. Qui non improbat approbat. In a strikingly similar situation in Hollowell v. Greenfield (1966), Ind.App., 216 N.E.2d 537, it was ruled a jury question whether David, 11-year-old son of an employee of a rug-cleaning plant, was an invitee or licensee; whether the owner of the plant owed David a duty of care, where the father had permitted David to accompany him to the plant on Saturday mornings, and where to the knowledge of the plant manager David sometimes played and sometimes assisted his father in the performance of his duties, including putting washed rugs through the wringer. The manager had never objected. On the Saturday morning in question David and his brother and another playmate were attracted to a quantity of comic books near the wringer. One of the children started the wringer and when David tried to pass a comic book through the rollers his left hand got caught between the rollers, mashing off all of his fingers save one. The court could not say that no legitimate inference could be raised that the boy was not on the premises "without at least the implied permission of the owner." We hold that the jury could find that Junior entered the rendering plant to assist his father on the evening in question with the implied consent of Kark's manager; that at the time and place in question Junior was not a trespasser, volunteer or mere licensee, but was an employee of a business visitor, as to whom Kark owed the duty to exercise ordinary care.

Twine v. Norris Grain Co., 241 Mo.App. 7, 226 S.W.2d 415, is no authority for appellant's position, because in that case the 16-year-old boy entered defendant's premises for the purpose of shooting pigeons, and not "for any purpose of real benefit or interest to defendant".

Gayer v. J. C. Penney Co., Mo.App., 326 S.W.2d 413, is distinguishable. There the 10-year-old boy exceeded the bounds of his invitation, went into the stockroom in which customers were not permitted, looking for his mother, and at that place he was merely a permissive licensee in pursuit of his own purpose and business, required as such to take the premises as he found them. Robidoux v. Busch, Mo.App., 400 S.W.2d

Robidoux v. Busch, Mo.App., 400 S.W.2d 631, points out that the real test of the status of invitee is the purpose of the visit; that one cannot be an invitee unless he is on the premises *for some purpose of real benefit or interest to the owner or possessor of the premises.* Plaintiff in that case was hurt on Grant's Farm while on a sightseeing tour. There was no evidence that her visit was of real benefit or interest to the landowner. In Roe v. St. Louis Independent Packing Co., 203 Mo.App. 11, 217 S.W. 335, plaintiff, one of a class of students permitted to visit a packing plant on request of their instructor, injured on the tour, was held a mere licensee, not an invitee, because the students were there solely for their own benefit and not for the benefit of the proprietor. These cases are to be distinguished from this case, in which Junior was hurt as he prepared to perform a function which would have been a real benefit to the owner of the premises, an act in which Kark had a real interest.

 The next question is whether Junior was guilty of contributory negligence as a matter of law, in view of his testimony that he knew the machinery in question was dangerous, knew the gears were running, and yet pushed the gear that caught his hand and injured him. Appellant urges that "a minor can be found guilty of contributory negligence as a matter of law when the minor is shown to have knowledge and appreciation of the danger which would be occasioned by his act that contributed to his injury." The applicable rule in the case of an *adult* employee was announced as follows, in passing upon the claim that a 30-year-old man who became entangled in the revolving drive shaft of a grain mill was guilty of contributory negligence as a matter of law: "Even where there is evidence of knowledge on the part of the employee of the danger of his place of work, or of the machinery with which he is provided, the question whether his acts and conduct in the light of such knowl-

edge constitute contributory negligence is a question of fact for the jury, unless the evidence is such that all reasonable men would conclude that he was guilty of negligence which contributed to the casualty. He will not be declared guilty of contributory negligence as a matter of law unless the danger is so glaring, open and obvious as to threaten immediate and almost certain injury, or that a man of ordinary prudence would not attempt to occupy the place or use the machinery [citing five and quoting from two additional cases]." Keeney v. Callow, Mo.Sup., 349 S.W.2d 75, 81 [10]. While the minority of a plaintiff does not preclude the defense of contributory negligence, the standard for judging the conduct of a minor is not that care and prudence that would be exercised by an adult but only that ordinarily exercised by one of the age, intelligence, discretion, knowledge and experience of the particular plaintiff, under the same or similar circumstances. Bridges v. Arkansas-Missouri Power Co., Mo.App., 410 S.W.2d 106, 111 [3], and the many Missouri cases and authorities cited, fn. 2. Other principles pertinent to an inquiry such as this[1] are that an essential element of contributory negligence is "a voluntary exposure to known danger," and that it is knowledge and appreciation of the danger and risk of injury in an instrumentality or condition that bars recovery for contributory negligence, and not merely knowledge of the physical characteristics of the instrumentality or condition; that "[m]ere knowledge that injury might result, without appreciation of the risk of injury to which his conduct exposed him, is not sufficient." Capacity to appreciate the danger is of vital importance in making the determination. In Bridges the court considered the "sorry scholastic record" of the 16-year-old plaintiff significant. In Lynch v. Rosenthal, Mo.App., 396 S.W.2d 272, a 22-year-old farm helper was injured when his right arm was caught in a cornpicker. In ruling that his contributory negligence was a matter for the jury to de-

---

1. as pointed out in Bridges, supra, 410 S.W.2d l.c. 111 [4, 5], fns. 3 and 4.

termine the court stressed the evidence indicating that his full usable mentality was below that of a 10-year-old child.

In Cathey v. DeWeese, Mo.Sup., 289 S.W.2d 51, a 17-year, 5-months-old farm hand of average intelligence and a ninth grade education lost his leg while operating a hay baler. He knew that there was danger in his mounting the machine with the power take-off in gear and in attempting to disengage the tie arm with his foot or in attempting to unclog the machine. He had used the machinery for three weeks, and his employers had instructed and warned him of the danger. Notwithstanding, this Court held his contributory negligence a jury question; that "It is not enough that a boy may have been warned, or that the danger was visible, or that he had some knowledge of the hazard, the question is whether, by reason of his youthfulness and inexperience, reasonable minds could differ as to his realization and appreciation of the danger. [Citing cases.] Leon's awareness of some danger is not conclusive evidence of contributory negligence. Rupp v. Chicago, B. & Q. R. Co., Mo.App., 234 S.W. 1050, 1054, and his testimony that he knew it was dangerous to come in contact with the rollers is not an admission that he *appreciated* the hazard. Benjamin v. C. Hager & Sons Hinge Mfg. Co., Mo.App., 273 S.W. [754,] loc. cit. 757; Carter v. Baldwin, [107 Mo.App. 217, 81 S.W. 204] supra. Not only must the minor employee have had knowledge of the danger, it is essential that he must have *appreciated* the hazard before it can confidently be said that there could be no reasonable difference of opinion as to the rashness and imprudence of his conduct. As the court said of the seventeen year old boy injured on a cotton spin-dryer in Evans v. General Explosives Co., 293 Mo. 364, 375–376, 239 S.W. 487, 491, 'although the danger in operating machinery may be visible, if by reason of the youth and inexperience of the operator he does not realize, or, in other words, is not aware of the danger to which he is exposed, it is the duty of the employer to warn him of his peril.' Or as

it was stated in the leading case of Burger v. Missouri Pac. Ry. Co., 112 Mo. 238, 249–250, 20 S.W. 439, 441, 'In the conduct of a boy, we expect to find impulsiveness, indiscretion, and disregard of danger, and his capacity is measured accordingly. A boy may have all the knowledge of an adult respecting the dangers which will attend a particular act, but at the same time he may not have the prudence, thoughtfulness, and discretion to avoid them which are possessed by the ordinarily prudent adult person.' In all the circumstances reasonable minds could well differ as to Leon's comprehension, realization, or appreciation of the hazards to which he was exposed and the adequacy of his employers' instructions and warning, and his contributory negligence and his employers' liability were not plainly determinable as a matter of law. [Citing 8 cases involving boys seventeen, eighteen and nineteen years of age.]" 289 S.W.2d, l. c. 56, 57.

■ That the question of contributory negligence of a minor servant (whether he knew and appreciated the dangers of the employment and the risk of injury) is usually a jury question was well expressed in the able analysis of the Missouri cases in Wilson v. White, Mo.App., 272 S.W.2d 1 [13–17], beg. p. 7. And see "Contributory Negligence of a Minor as a Matter of Law in Missouri," James W. Starnes, Washington University Law Quarterly, 1959, p. 281, beg. p. 287.

■ While Junior knew the physical characteristics of the winch and the working gears; knew that the gears were running; knew generally that there was danger involved and that injury might result, we cannot conclusively say, as a matter of law, that in pushing the idling gear over he voluntarily exposed himself to a known danger, or that the danger was so glaring, open and obvious as to threaten immediate and almost certain injury, or that all reasonable men would conclude that he actually appreciated the hazard, considering his mental ability (a boy almost 14 years old, in

a special opportunity school, doing third or fourth grade work which is ordinarily done by 9 and 10-year-old children). Many children with a mental age of 9 or 10 years and an interest in things mechanical would likely have acted as this child acted. "To many active and enterprising children, risks not absolutely appalling, are attractive; * * *. [T]he adjudged cases in the books show that children do frequently incur equal, or even greater, hazards. We cannot, therefore, account this boy's conduct unnatural or extravagant." Pennsylvania R. Co. v. Kelly (1858), 31 Pa. 372, 378. The question of contributory negligence was properly left to the jury.

### ERROR IN INSTRUCTIONS?

Plaintiff's main verdict-directing Instruction No. 2 hypothesized the exposure and unguarded condition of the gears and working parts, as a result of which "the winch was not reasonably safe for the use by persons upon defendant's premises upon the furtherance of defendant's business"; knowledge of this condition by defendant and lack of knowledge thereof by plaintiff and failure of defendant "to use ordinary care to either install guards or to warn of said condition." It concluded with the submission that as a direct result of such failure plaintiff was injured "unless you believe plaintiff is not entitled to recover by reason of Instruction No. 6."

The other instructions are short and will be recited verbatim:

### "INSTRUCTION NO. 3

"The term 'ordinary care' as used in these instructions with respect to the defendant, means the failure to use that degree of care that an ordinarily careful and prudent person would use under the same or similar circumstances."

### "INSTRUCTION NO. 6

"Your verdict must be for the defendant, whether or not defendant was negligent, if you believe:

"First, plaintiff either:

"failed to keep a careful lookout, or placed his hand in contact with working gears of the winch; and

"Second, plaintiff's conduct, in any one or more of the respects submitted in paragraph First, was negligent; and

"Third, such negligence of plaintiff directly caused or contributed to cause any damage plaintiff may have sustained."

### "INSTRUCTION NO. 7

"The term 'negligence' as used in these instructions with respect to the plaintiff, means the failure to use that decree of care which a ordinary prudent boy of the same age, capacity and experience would use under the same or similar circumstances."

### "INSTRUCTION NO. 9

"Your verdict must be for defendant if you believe plaintiff undertook to operate the Kark winch for his own purpose, pleasure, or curiosity without the consent of defendant."

 The first ground of attack is that while No. 2 referred to No. 6 it did not refer "to the affirmative defense offered" in No. 9; that No. 2 ignored the element of duty, was inconsistent with and confusing when read with No. 9, and in effect told the jury that the qualifying phrase in paragraph Fifth of No. 2 was not applicable to "the affirmative defense" in No. 9. Citing MAI comments at page XXXIV of the Committee on Jury Instructions, Moore v. Ready Mixed Concrete Co., Mo.Sup., 329 S.W.2d 14, and § 509.090, V.A.M.S., appellant argues that under MAI 22.03 it is mandatory that the main verdict-directing instruction refer to every instruction which sets up an affirmative defense; that No. 2 fails to refer to No. 9, and that under Civil Rule 70.01, V.A.M.R., it is error to violate the rule. In our judgment No. 9 did not undertake to submit an affirmative defense but in form and substance was an instruc-

tion conversing that portion of paragraph First of No. 2 referring to the use of the winch "by persons upon defendant's premises upon the furtherance of defendant's business." A defendant has the option to submit its theory of the case by way of a converse instruction, without being required to directly negative the plaintiff's theory of the case. Number 9 follows the third approved method of giving converse instructions. MAI § 29.01, p. 246.

 Next, it is argued that No. 2 improperly submitted failure to warn of the defective condition "when there was no duty shown on the part of the defendant to so warn and there was no evidence to support the submission of failure to warn." There was direct evidence of failure to warn and there was a duty to warn. While there was considerable evidence that Junior had knowledge of the physical conditions (the motor, the open gears, the lever, and the fact that the gears were turning) and was generally aware of the danger, there is no conclusive evidence that this boy with his 3rd or 4th grade mentality possessed a sufficiently keen sense of appreciation of the danger to relieve the owner-occupier of the premises from the duty of issuing a warning of the potential danger involved in assaying to operate this machinery, which the evidence showed was substandard from the standpoint of statutory safety regulations.

 Complaint is made that Instructions 2 and 3 did not use the word "negligence," but instead employed the phrase "failed to use ordinary care," which it is said does not carry with it the requirement of a finding of "a legal duty to conform to a standard of conduct for the protection of others against unreasonable risks." Number 2 is an adaptation of MAI 22.03, and No. 3 follows MAI No. 11.05. Neither of the approved instructions used the word "negligence" and there is no necessity of, or magic in, using that term when the same concept is projected by the use of other appropriate language. In our judgment Nos.

2 and 3 properly fixed the proper standard of care as that of ordinary care, defined the failure to use ordinary care, and hypothesized defendant's failure to conform to that standard.

 It is further argued in appellant's brief that under No. 2 the jury could have returned a verdict for this plaintiff upon finding that defendant failed to exercise ordinary care as to the persons in a class ("persons upon defendant's premises upon the furtherance of defendant's business") without being required to find that plaintiff was a member of the class to whom the legal duty was owed, and therefore plaintiff failed to instruct on all the necessary elements of his case. No objection was made at trial to No. 2. The only objection to No. 2 in the motion for new trial in any way related to this point is that there was no evidence in the record to support the above quotation, and that this phrase assumed and directed a finding that plaintiff was not a bare licensee or volunteer. Our previous analysis demonstrates that there was sufficient evidence to find that Junior was upon defendant's premises upon the furtherance of defendant's business. That the phrase above quoted does not assume and direct a finding that plaintiff was not a bare licensee or volunteer seems evident. Any doubt of that fact is dissipated by considering No. 9, in connection with No. 2. Reading the two instructions together, as must be done, it does not follow that No. 2 assumes or directs a finding on this issue. It is more reasonable to conclude that the court is leaving it up to the jury to decide whether plaintiff was upon the premises pursuing his personal business or in furtherance of defendant's business.

 The final attack on the instructions is that No. 7 used the word "decree" instead of the word "degree." Pointing out the dictionary definitions of the two words, appellant contends that the confusing implication of the word "decree" amounted to a misdirection of the jury. This is obviously a typographical error, and the "obvious

misspelling of the word was an insubstantial and trivial imperfection. Absolute perfection in form is not the test. The test is whether the instruction is *substantially correct*." Wegener v. St. Louis County Transit Co., Mo.Sup., 357 S.W.2d 943 [3], in which we approved an instruction mistakenly using "eminent" for "imminent" peril. The instruction is substantially correct, and we are not convinced that the jury was misled or confused by this minuscule mistake.

■ A point is made that the court erred in failing to discharge the jury because plaintiff's attorney, in closing, argued to the jury that the damages should be computed on the basis of $2,000 per year for 50 years of life remaining to plaintiff, the complaint being that by this "per unit basis" argument the jurors had implanted in their minds figures not admissible and not admitted in evidence. The court sustained the objection with the comment that "You can't make a mythical calculation based on life expectancy, and the jury will disregard that part," but declined to discharge the jury. In support of this point appellant cites Faught v. Washam, Mo.Sup., 329 S.W.2d 588, 602–604. In that case the trial court did not sustain but in effect overruled the objection. In this case not only was the objection sustained but also the court made a pointed comment which had a tendency to neutralize the effect of the suggestion and in addition directed the jury to disregard that part of the argument. Under the circumstances we are not persuaded that the unjustifiable argument entered into the verdict to the prejudice of appellant.

■ The final point is that the verdict is excessive. Plaintiff's injuries include the loss of his right hand between wrist and elbow (he was right-handed); the loss of the skin and one inch of the underlying tissue over an area 5–10 inches square on the right anterior hip and thigh; permanent scar tissue on leg and thigh; pain and suffering; psychological effect of amputation of a hand. At trial time the injured areas were well healed, but there remained a scooped out area at the anterior hip and behind the lower posterior thigh. Shortly before trial an examination revealed that plaintiff's right leg was almost as good as the left; that the boy walks and runs normally; and although he has a slight loss of power in moving the leg to the outside, he mows lawn for several families, and can climb and jump. A physician did not believe that the affected areas of hip and thigh (where the tissue now is thinner than normal) would be bruised in the future so as to cause broken bone, inflammation or infection, although these are possibilities. Junior has an artificial hand which he works quite well. He can tie his shoe laces, dress himself and he has learned to write with his left hand. Considering the serious nature, extent and permanence of the injuries: the amputation of his hand and a part of his arm; the other painful and practically nondisabling but cosmetically repulsive injuries; the fact that because of plaintiff's mentality and inclination toward manual, not mental, activity and pursuits he will likely be dependent upon the use of his hands for his livelihood; his age and life expectancy of approximately 55 years; the mental and physical pain and suffering; that medical and hospital expenses, loss of earnings, and other special damages are not a factor in this minor's case; that his earning capacity has not been demonstrated because of his youth, and all of the many other factors which must be weighed, we are of the opinion that this verdict is not excessive in this day and time

Judgment affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

HENLEY, P. J., and SEILER and HOLMAN, JJ., concur.

STORCKMAN, J., not sitting when cause was submitted.