Cornell **LOTT**, Plaintiff-Appellant,

v.

**ANHEUSER–BUSCH, INC.,** a Corporation, Defendant-Respondent.

No. 34087.

Missouri Court of Appeals, St. Louis District.

May 23, 1972.

Silver & Suffian, Milton Suffian, St. Louis, for plaintiff-appellant.

Heneghan, Roberts & Godfrey, W. Munro Roberts, Jr., James J. Virtel, St. Louis, for defendant-respondent.

BRADY, Chief Judge.

Action for injuries sustained while plaintiff was working at defendant's plant. At the conclusion of plaintiff's evidence, the trial court on motion of the defendant, entered a directed verdict. Plaintiff appeals.

The plaintiff's evidence disclosed that on July 19, 1967 he was employed by the Bee Line Leasing Company as a truck driver, hauling cases of bottles and cans from manufacturing companies to the defendant's plant. The loading and unloading of the trucks is done in defendant's building at a loading dock. The truck driver enters the building from the west end and proceeds in an easterly direction until he arrives at the loading dock inside defendant's building. A load consists of pallets containing cases of cans stacked two high and in two rows the length of the trailer. The back of the truck goes on a ramp elevating the trailer bed so it is level with the dock. The loading and unloading is done by means of conveyer rollers. The pallets are initially pulled from the truck by a conveyer system built into the truck itself. They then go onto a table containing reversible rollers. The table extends about eight feet from the end of the truck. It consists of rollers approximately eight and one-half feet wide and four inches in diameter interspersed with steel plates about three inches wide and approximately three-fourths of an inch below the top of the rollers. There is a half inch space between the rollers and the steel plates. The rollers on the table are all powered; none of them run free.

After unloading, the normal procedure was that the various truck drivers would reload with empty pallets to be returned to the various manufacturing companies. After all of the loaded pallets are off the truck, and off of this reversible table, empty pallets are brought in from the side on another system of conveyer rollers. While the unloading is automatic in that the rollers on the table are activated by the pallets breaking a beam of an electric eye, reloading is not activated until one of defendant's employees, the dock operator, pushes a button causing the rollers to depress some four inches until the pallets are pulled on the table. The operator is stationed on a catwalk eight feet away from the dock itself and approximately twenty feet in length. The empty pallets hit a trip level which raises the table back up and the rollers begin in an easterly direction carrying the empty pallets into the truck. The pallets go into the truck side by side. No other pallets come onto the table until the dock operator again pushes the button to depress the rollers. There was no guard rail on the dock; no area marked as a safety area on the dock; no signs of any type on the dock; and the only place to stand was on a solid steel plate about six inches wide on one edge of the dock or table. On the occasion in evidence the plaintiff was involved in reloading the truck with empty pallets when the pallets became jammed. In an effort to loosen them he stepped on moving rollers and fell from the loading dock to the ground—a distance of about eight feet—thereby injuring his back.

It frequently happened when empty pallets were being loaded onto the truck that the pallets would become hung up on the

side of the truck and the driver would have to straighten them out. Defendant furnished the drivers with four steel bars approximately three to five feet long and two hooks with which to loosen and straighten out the empty pallets. It was not possible to unjam the pallets on the right side of the truck from the six inch plate along the left side of the conveyer rollers. When pallets were jammed on the right side the plaintiff, as well as the other truck driver who testified, stated that it was necessary to step on the rollers in order to pry the jammed pallets loose. The motion of the rollers was controlled by defendant's employee who was on the catwalk. There was no way for the truck driver to stop the rollers without the assistance of the operator.

Plaintiff testified that all the while he had been working for the Bee Line Leasing Company, seven years, his entire job had been delivering and taking cans and empty pallets from defendant's plant. Plaintiff testified that in the two and one-half years immediately prior to the accident he had hauled approximately 2,600 loads to defendant's plant with approximately 1,734 visits to the dock where this injury occurred. On approximately one-third of these visits he had taken empty pallets with him when leaving the plant. He has never been given any assistance by anyone employed by defendant and has never received any instructions from defendant as to stopping or starting the rollers. The plaintiff was instructed on operating the loading dock by one of Bee Line Leasing Company's employees when he first came to work.

On the occasion when this injury occurred, plaintiff was working the late shift at approximately 9:30 p. m. and he was in the process of loading empty pallets onto the truck. Some of the pallets were hung up on the opposite side of the table and he stepped on the rollers to try to loosen them. It was at this time that the sole of his shoe caught between the protective plate and the rollers and he fell to the ground, a distance of some eight and one-half feet.

At that particular time the defendant's employee was on the catwalk some twenty-five feet away from the dock and the switch controlling that dock. The plaintiff testified that he did not ask the operator to stop the conveyers. He also testified that at the time he stepped on the table he knew the rollers were moving and he knew there was some risk of his being injured. Despite this, the plaintiff went ahead and stepped on the rollers without trying to yell or signal the operator.

After testimony by the treating physician for the plaintiff and one other witness, a truck driver engaged by the same company, plaintiff called a Mr. William Winkler who was qualified as an expert witness; i. e., a safety engineer. The witness testified that pursuant to plaintiff's request he had made an inspection of the automatic dock at defendant's plant. Upon defendant's objection a side bar conference was held by the court with the two attorneys. In an offer of proof the plaintiff's attorney stated that the witness would testify that his inspection revealed defendant had failed to provide a safe place to work for the plaintiff. The court refused to allow the testimony of the witness as being irrelevant to the proceeding. The plaintiff then indicated he had nothing further to offer other than cumulative evidence, and the court sustained defendant's motion for a directed verdict.

A review of the record discloses that the trial court, consistent with the general rule, accorded plaintiff the status of an invitee. The court could not find a breach of any duty owed plaintiff by defendant and sustained the motion for a directed verdict on that ground.

Plaintiff's allegations are not plainly stated or easily discernible but we understand his first two points to be: "* * * the Trial Court * * * mistakenly identified the legal status of the plaintiff on the premises of the defendant [as business invitee] and consequently erred in interpreting the duty that the defendant owed the plaintiff * * *." In other words, plain-

tiff contends he was defendant's employee and was entitled to a safe place to work.

The primary thrust of plaintiff's argument is based on this court's decision in Kiehling v. Humes-Deal Co., Mo.App., 16 S.W.2d 637; and the Supreme Court's decision in Bollman v. Kark Rendering Plant,. Mo., 418 S.W.2d 39. The facts of the latter case seem peculiarly analogous to the case at bar. There the plaintiff was a young boy, thirteen years and ten months of age, who had a learning disability. He frequently accompanied his father when collecting and delivering dead animals and offal to defendant Kark and other rendering plants. Kark provided for plaintiff's father and other such independent contractors a motor operated winch for unloading the carcasses. The evidence showed that the gear mechanism which operated the winch was unsafe in that it had no cover over the gears. Also, there were no warning signs present and neither plaintiff nor his father had ever been instructed by any of Kark's employees in the manner of operating the winch. Kark's manager had seen plaintiff with his father at the plant, and had never complained. On the day in question, the father at plaintiff's request allowed plaintiff to operate the winch, a job he had never performed before but which he had seen his father and Kark's employees do many times. The plaintiff was subsequently injured when his hand became caught in the unsafe gear mechanism. On appeal, the Supreme Court answered Kark's allegation that plaintiff was a trespasser or a licensee by holding that his father as an independent contractor was a business invitee. In this regard Missouri has long approved the principle formulated in Restatement, Second, Torts § 343, p. 215, concerning business invitees. That section in its present form states: "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should

expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger." For the earlier version of this rule see Dixon v. General Grocery Co., Mo., 293 S.W.2d 415; Haire v. Stagner, Mo.App., 356 S.W.2d 305; and cases there cited. As indicated in the reporter's notes, the new statement is merely a condensation and rewording of the version stated in Restatement I. The version set out in Restatement II is identical in theory with that previously approved in the cases above cited. Plaintiff however contends that the Bollman decision creates a higher standard of care owed employees of independent contractors by land owners than that owed other business invitees. He bases this on the statement in Bollman, 418 S.W.2d at page 44, that: " * * * As to them [employees of independent contractors] the landowner owes a nondelegable duty to exercise ordinary care for their safety." We do not so read the Bollman decision.

Immediately following the above quoted portion are citations to Schneider v. Southwestern Bell Tel. Co., Mo.App., 354 S.W.2d 315, 318; and McDonnell Aircraft Corp. v. Hartman-Hanks-Walsh Painting Co., Mo., 323 S.W.2d 788, 794. Both of these cases held that the landowner has a nondelegable duty to warn employees of independent contractors of dangerous conditions which he knows to exist, a duty which cannot be delegated to the independent contractor. But more than this, the decision in Bollman did not eliminate the element of establishing liability set out in the Restatement in Sub-Section (b) above quoted; i. e., that the landowner should expect that they will not discover or realize the risk. The reasoning behind Bollman was that there was a duty to warn because the plaintiff was in fact a young boy with a third or fourth grade mentality and there was no conclusive evidence to show that he possessed a sufficiently keen sense of appreciation of the danger to relieve the owner occupier of the premises from the duty of issuing a warning. In other words, the

issue was for the jury as to whether the plaintiff could and did appreciate and realize the risk involved. *Bollman* does not impose a greater duty upon landowners owed to employees of independent contractors than that owed other business invitees as stated in the Restatement standards. The decision in Martin v. First Nat. of Independence Co., Mo., 372 S.W.2d 919, illustrates that beyond question *Bollman* and *Kiehling* do not stand for the plaintiff's position. To the contrary, in those cases the court reaffirmed the approval of the standards set out in the Restatement. In Martin the court considered practically the same argument as herein presented, stating: (*Martin,* supra, 1. c. 923) "The cases cited by plaintiff do not prescribe a standard different from that mentioned above. Thus in Kiehling * * * the *general contractor* engaged in constructing a building was held liable to a subcontractor's employee * * * on the theory the builder was in possession and control of the premises and under a duty to furnish a safe place to work for the subcontractor's employees. * * * In McDonnell * * * the plant owner was held to owe a nondelegable duty to warn an employee * * * of the presence of exposed electrical wiring which was unknown to the employee although the painting contractor had expressly agreed to give the warning."

■ From the foregoing, it is apparent that the law does not confer upon the employee of an independent contractor the status of an employee of the landowner merely because he works in the building and on equipment supplied by the landowner. Similarly, the law does not impose upon a landowner a greater standard of care for employees of independent contractors than for other business invitees. Thus the trial court did not err in refusing to give plaintiff the status of an employee of defendant.

With regard to plaintiff's combined allegations as set out above, there remains only the question of whether a submissible case of negligence by the defendant was made to the jury. Viewing the evidence most favorable to the plaintiff, we are unable to make such a finding.

■ As this court stated in Small v. Ralston-Purina Co., Mo.App., 202 S.W.2d 533, 1. c. 539: " * * * The rule is that a landowner is *not* liable to an invitee for injuries resulting from an obvious condition as well known to the invitee as to the owner; and if the invitee is aware of the condition, or it is such that he must be conscious of it and of the consequence of disregarding it, he cannot recover." (Emphasis supplied.) See also Dixon v. General Grocery Co., supra; Haire v. Stagner, supra, and McTurman v. Bell, Mo.App., 398 S.W.2d 465.

■ The evidence conclusively demonstrates that plaintiff did not make out a case of negligence on the part of defendant. Plaintiff was a man thirty-three years of age with no evidence of learning disabilities or diminished mental capacity. Plaintiff testified that in the two and one-half years prior to the accident he had made some 1,700 trips to this particular dock. On the day of the accident, the dock was operating in a normal manner. There was nothing unusual about the operation of the dock that particular day. Prior to stepping on the dock, plaintiff knew the rollers were moving and he knew that stepping or standing on moving rollers involved some risk of falling. The trial court was correct in directing a verdict for defendant.

■ In view of our holding, we do not have occasion to consider plaintiff's other allegations of error. Since negligence was not established, there is no need to determine whether plaintiff's stepping on the moving rollers was contributory negligence as a matter of law. With regard to the admissibility of the testimony of the safety engineer, since no duty was owed, his testi-

mony that the premises were not safe was irrelevant and immaterial. Therefore it was properly held inadmissible.

The judgment is affirmed.

SIMEONE, WEIER, and CLEMENS, JJ., concur.